Robert J Vanden Bos OSB #78100
Douglas R. Ricks, OSB #044026
Christopher N. Coyle, OSB #07350
VANDEN BOS & CHAPMAN, LLP
319 S.W. Washington, Suite 520
Portland, Oregon  97204
TELEPHONE:  (503) 241-4869
FAX: (503) 241-3731

Of Attorneys for Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In re | ) | Case No. 16-30406-rld11 |
| | ) | |
| SeaPort Airlines, Inc., | ) | DEBTOR'S MOTION FOR AN ORDER |
| | ) | AUTHORIZING DEBTOR TO ASSUME A CERTAIN |
| | ) | CREDIT CARD PROCESSING AGREEMENT |
| | ) | WITH AMERICAN EXPRESS COMPANY |
| Debtor-in-Possession. | ) | EFFECTIVE AS OF THE PETITION DATE |

The Debtor-in-Possession, SeaPort Airlines, Inc. ("Debtor"), requests entry of an

order authorizing Debtor to assume a certain credit card processing agreement with

American Express Company ("AMX") effective as of the Debtor's petition date (February 5,

2016) (the "Petition Date").  In support of this Motion Debtor represents and states:

1. On February 5, 2016 ("Petition Date"), the Debtor commenced a

reorganization case by the filing of a voluntary petition under Chapter 11 of the United

States Bankruptcy Code (the "Code").

2. Pursuant to Sections 1107 and 1108 of the Code, the Debtor is continuing in

possession of its property and is operating and managing Debtor's business as a debtor-in-

possession.

Page 1 of 6 -   DEBTOR'S MOTION FOR AN ORDER AUTHORIZING DEBTOR TO ASSUME A CERTAIN
CREDIT CARD PROCESSING AGREEMENT WITH AMERICAN EXPRESS COMPANY
EFFECTIVE AS OF THE PETITION DATE

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

Case 16-30406-rld11    Doc 8    Filed 02/05/16

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the standing order of reference of the District Court.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.      Debtor seeks authority to assume the certain credit card processing agreement dated October 28, 2008 between AMX and Debtor (a copy, redacted in accordance with FRBP 9037, of which is attached as **Exhibit A**) (the "Agreement") effective as of the Petition Date.

5.      The Agreement is necessary in order for Debtor's customers to purchase tickets for air travel from the Debtor using the AMX credit card.  AMX purchases are essential to the Debtor's business because a significant portion of the Debtor's sales are made using this credit card.  Continuation of AMX's processing function is vital to the Debtor's operation.  Assumption of the Agreement at this time will avoid disruption to the most significant method of payment by the Debtor's customers and will provide customers and other creditors reassurance that this vital agreement for operation is securely in place. Debtor proposes that after the order of assumption is entered, if the Agreement is terminated or rejected during the pendency of this case (including if this case is converted to one under Chapter 7), AMX shall not submit an administrative claim against the Debtor asserting rights based on such assumption (but AMX shall retain all administrative claims related to its postpetition performance and shall retain all other non-administrative claims). Assumption of the Agreement as of the Petition Date is necessary to ensure efficient and effective processing and Debtor's receipt of customer payments. The Debtor believes that assumption of the Agreement at this time on the terms stated above is appropriate and in the best interests of the Debtor's estate.

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

6. Pursuant to Code Sections 365 and 105, Debtor requests authority to assume the credit card processing agreement with AMX, and pursuant to terms of the proposed Order attached hereto as **Exhibit B**.

## BACKGROUND

7. Debtor is an Alaska corporation with its principal place of operations in Portland, Oregon that operates a scheduled airline in the United States out of its principal hubs at the Portland International Airport ("PDX") and Memphis International Airport ("MEM"). A regional airline focused on connecting rural communities to the national transportation network, Debtor operates a fleet of five (5) leased aircraft on routes with destinations in El Dorado, Harrison and Hot Springs, Arkansas; Houston, Texas; Memphis, Tennessee; and Pendleton and Portland, Oregon.

8. Due to a change in federal regulations on pilot qualifications, small airlines like Debtor have experienced an extreme attrition in available pilots. As such, Debtor has had to implement a new recruitment and retention plan for its pilots.

9. However, the pilot shortage problem was far greater than Debtor could reasonably accommodate and as a result, Debtor had to cancel service to many areas for its survival. Within the last thirty days, Debtor has had to cease flights to Sacramento, Visalia, Burbank, San Diego and Imperial, California, as well as North Bend, Oregon (effective March 20, 2016); Salina and Great Bend, Kansas; Kansas City, Missouri; and San Felipe, Baja California in Mexico.

10. As a result of the foregoing events, Debtor has seen a drastic reduction in its revenues and is unable to meet its current liquidity needs. In order to implement its planned reorganization, Debtor requires stability with its current revenue streams and payment systems. For that reason Debtor seeks approval of this Motion.

DEBTOR'S MOTION FOR AN ORDER AUTHORIZING DEBTOR TO ASSUME A CERTAIN CREDIT CARD PROCESSING AGREEMENT WITH AMERICAN EXPRESS COMPANY EFFECTIVE AS OF THE PETITION DATE

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

**THE AGREEMENT WITH AMX**

11.     The Debtor derives a substantial portion of its annual passenger ticket revenue from passengers who pay with an AMX credit card. The ability of the Debtor to accept the AMX credit card is vital to its ongoing business operations. In order to be in a position to accept and receive such credit, the Debtor must be party to a merchant services agreement or similar agreement with a party that has access to the credit card payment and collection systems. The Debtor's Agreement with AMX is a merchant services agreement which satisfies this requirement.

12.     Under the Agreement, AMX processes the transactions of Debtor's customers who pay with an AMX credit card. AMX accepts credit card sales slips submitted by the Debtor which are received from its customers who purchase services. AMX submits the sales slips through the applicable credit card system for payment. The credit card company makes provisional payment to AMX on account of the sales slips submitted by AMX. To the extent a sales slip is later the subject of a chargeback under the AMX rule (for example, if a cardholder claims the contracted services were not performed), AMX have the right to recover the funds provisionally credited with respect to such sales slip. Therefore, AMX as the party in contractual privity with AMX is at risk for the Debtor's future performance to passengers who purchased tickets since such passengers have a right to receive the funds back if the Debtor does not perform. To protect against such risk, pursuant to the terms of the Agreement, AMX retains the amounts received through the AMX system pending performance by the Debtor of the services it contracted for with its cardholder customers (i.e., completes the applicable flight) and to cover the Debtor's obligations to AMX (the amount withheld being called the "Deposit"). AMX's obligation to transfer funds to the Debtor on account of a sales slip submitted by the Debtor to AMX

DEBTOR'S MOTION FOR AN ORDER AUTHORIZING DEBTOR TO ASSUME A CERTAIN CREDIT CARD PROCESSING AGREEMENT WITH AMERICAN EXPRESS COMPANY EFFECTIVE AS OF THE PETITION DATE

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

arises only when the Debtor has flown the flight or otherwise provided the goods or service

associated with such sales slip.  AMX deducts amounts owing AMX under the Agreement

(i.e., processing fees and other amounts) prior to remittance of funds to the Debtor.  The

amount of the deposit on the Petition Date was approximately $18,397.00.

## RELIEF REQUESTED

13.    The Debtor seeks an order authorizing assumption of the Agreement

pursuant to section 365 of the Bankruptcy Code effective as of the Petition Date.  As set

forth above, a substantial portion of the Debtor's revenue is received from passengers who

pay with an AMX credit card.  The Debtor averages slightly over 80 credit card transactions

every day.  Approximately 10% of the revenue generated by Debtor is received by the

Debtor from AMX credit card sales.  Without a merchant agreement to facilitate the

purchase of tickets and other goods and services offered by Debtor with the AMX credit

card, the Debtor would suffer a fatal competitive disadvantage.  The continuation of the

Agreement with AMX is essential to the preservation of the going concern value of the

Debtor and to provide assurances to the Debtor's customers and creditors that this vital

contract is not in danger of termination.

14.    The Debtor has explored options with respect to entering into processing of

credit card transactions with other processors.  However, the number of credit card

processors is limited in general but very few are willing to provide such services for airlines.

The Debtor does not believe that it would be able to obtain a processing agreement within

a short period of time that would contain terms as favorable as provided by the Agreement.

15.    Debtor requests that AMX consent to the assumption but without limitation or

waiver of any claims, rights or remedies arising or incurred prior to or on the termination or

breach, including, without limitation, chargeback rights and other rights and claims related

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

to transactions processed by AMX prior to termination or breach, and such rights or claims will be entitled to administrative expense priority except to the extent provided in the previous sentence.

16.     The Debtor is not in default under the Agreement.  Therefore, there are no out of the ordinary costs associated with the assumption of the Agreement.

17.     The Debtor asserts that assumption of the Agreement, as modified, at this time is appropriate and in the best interest of its estate.

18.     In other Chapter 11 cases involving debtors in the passenger airline business that rely on credit card sales for a substantial portion of their revenue, courts have routinely granted the debtor authorization to assume their agreements with credit card companies upon the commencement of a chapter 11 case.  See, e.g., In re Hawaiian Airlines, Inc., Case No. 03-00817 (Bankr. Haw. Mar. 21, 2003); In re UAL Corp., et al., Case No. 02-48191 (Bankr. N.D. Ill. Dec. 9, 2002); In re US Airways Group, Inc., et al., Case No. 02-83984 (Bankr. E.D. Va. Aug. 11, 2002); In re Trans World Airways, Inc., Case No. 01-00056 (Bankr. D. Del. Jan. 12, 2001).

WHEREFORE, the Debtor requests an order authorizing the Debtor's assumption of the Agreement as described herein, and pursuant to the proposed Order submitted herewith and for such further relief as the Court deems just and proper.

Respectfully submitted;

VANDEN BOS & CHAPMAN, LLP


By:/s/Robert J Vanden Bos
        Robert J Vanden Bos, OSB #78100
        Douglas R. Ricks, OSB #044026
        Christopher N. Coyle, OSB #07350
        Of Attorneys for Debtor-in-Possession

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

# EXHIBIT A



American Express
PO Box 53601
Phoenix AZ 85072


00545

Juneau Aeronautics Inc
Seaport Air
115 SW. Ash St, Suite 500
Portland,, OR 97204

September 09, 2008

Ալ.Ալ.Ալ.Աll.Աl.Աll.Աll.Աl.Աlll.Аll

Dear Seaport Air,

Welcome to American Express! Thank you for joining the network of fine establishments worldwide that accept American Express® Cards. We're excited to have the opportunity to work with you.

Enclosed you'll find your American Express merchant account information and the terms and conditions of our Agreement. Please take a few moments to review your account information and contact us with any questions or changes.

During setup you elected to authorize and submit charges electronically. Before you can start processing American Express transactions, you will need to contact your terminal provider to notify it of your new American Express Merchant Number and request to have your terminal programmed accordingly.

Your terminal provider will be able to tell you how long it will take to program your terminal and when you will be ready to start accepting American Express charges. You can find your terminal provider's telephone number for servicing issues on its statement or terminal decal.

To provide you with fast and hassle-free payment, we can automatically deposit your funds into your designated bank account. If you have not already provided us with your bank account information, please call us at 1-800-528-5200.

**Within the next week, you'll receive a welcome kit including a quick reference guide.** This guide includes information you need to start processing transactions with the American Express® Card, as well as resources and services that can help you manage and grow your business more efficiently.

**You'll also receive American Express decals in the kit.** By placing these decals on your door and other visible areas, current and potential customers will know that you now accept the American Express® Card.

Once again, thank you for giving us the opportunity to work with you. If you have any questions, we're here to assist you seven days a week at 1-800-528-5200.

Sincerely,

William H. Glenn
President, Global Establishment Services and Global Merchant Group

CNVEUNSN0002891

| Merchant/Establishment Number: | 536-076-893-1 |
|---|---|

Floor Limit:        $0; <u>ALL</u> charges must be authorized.

Discount Rate:        2.70%

We may also charge you a flat transaction fee of up to $0.15 per Charge and/or a fee of 0.3% per Card Not Present Charge. These fees, if applicable, will be reflected on your statement

Check Payment/Advice Address:        JUNEAU AERONAUTICS INC.
SEAPORT AIR
115 SW ASH ST, SUITE 500
PORTLAND, OR 97204

Payment Method:        You have elected for your payment to be automatically deposited into your designated bank account and to authorize and submit your charges electronically.

Payment Plan:        Payment is sent to the check payment/advice address indicated above 3 business days after our cut off for receiving and processing Charges.

WHETHER OR NOT YOU HAVE SIGNED ANOTHER AGREEMENT, BY ACCEPTING THE AMERICAN EXPRESS® CARD FOR THE PURCHASE OF GOODS AND SERVICES, YOU AGREE TO BE BOUND BY THIS LETTER AND THE CURRENT TERMS AND CONDITIONS FOR AMERICAN EXPRESS CARD ACCEPTANCE ENCLOSED WITH THIS LETTER.



# TERMS AND CONDITIONS FOR AMERICAN EXPRESS® CARD ACCEPTANCE

## 1. SCOPE OF THIS AGREEMENT; DEFINITIONS AND GENERAL PROVISIONS

**a.** Scope. This document, the accompanying Schedules A, B and C, and our other policies and procedures (which we may amend from time to time) constitute your Agreement to accept American Express® Cards in the United States, Puerto Rico, the U.S. Virgin Islands, and other U.S. territories, and in Canada. By accepting our Cards you agree to be bound by this Agreement.

**b.** Definitions.

*Affiliate* means any entity that controls, is controlled by, or is under common control with either party, including its subsidiaries.

*Agreement* means this document, the accompanying Schedules A, B and C, and our other policies and procedures (which we may amend from time to time).

*American Express Card* and *Card* mean any card, account access device, or payment device bearing our or our Affiliates' Marks.

*Cardmember* means the person whose name appears on the Card.

*Charge* means a payment or purchase made on the Card. *Card Present Charge* means a Charge for which the Card is presented at the point of purchase. *Card Not Present Charge* means a Charge for which the Card is not presented at the point of purchase (e.g., Charges by mail, telephone, fax or the Internet), is used at unattended Establishments (e.g., customer activated terminals, called CATs), or for which the transaction is key-entered. *Disputed Charge* means a Charge about which a claim, complaint, or question has been brought.

*Chargeback* (sometimes called "full recourse" or "Full Recourse" in our materials), when used as a verb, means our reimbursement from you for the amount of a Charge subject to such right; when used as a noun means the amount of a Charge subject to reimbursement from you. *Immediate Chargeback* (sometimes called "Immediate Full Recourse" in our materials) means our right to Chargeback immediately and irrevocably without first contacting you or sending you an inquiry and for which you have no right to present any written response to dispute the Chargeback.

*Credit* means the amount of the Charge that you refund to Cardmembers for purchases or payments made on the Card.

*Establishments* means all of your and your Affiliates' locations, outlets, websites, online networks, and all other methods for selling goods and services, including methods that you adopt in the future. Establishment Number (sometimes called the "merchant" or "SE" number in our materials) is the unique number we assign to your Establishment; if you have more than one Establishment, we may assign to each a separate Establishment Number.

*Marks* mean names, logos, service marks, trademarks, trade names, taglines, or other proprietary designations.

*We*, *our*, and *us* mean American Express Travel Related Services Company, Inc.

*You* and *your* mean the entity accepting the Card under this Agreement and its Affiliates conducting business in the same industry.

Other defined terms appear in italics in the body of this Agreement.

**c.** List of Affiliates. You must provide to us a list of your Affiliates conducting business in your industry and notify us of any subsequent changes in the list. You must notify us if you have any Establishments in Canada and cause them to comply with an addendum to this Agreement governing Card acceptance there. You must notify us if you have any Establishments in Puerto Rico, the U.S. Virgin Islands, and any other U.S. territory, or in another area where the U.S. dollar is the local currency, as our Discount Rates, fees, and payment terms for Card acceptance may be different there. We will notify you of those terms.

**d.** For Your Use Only. This Agreement covers only you. You must not obtain Authorizations, submit Charges or Credits, or receive payments on behalf of any other party.

## 2. ACCEPTING THE CARD

**a.** Acceptance. You must accept the Card as payment for goods and services sold at all of your Establishments. You agree that Sections 2.a. through 2.d. are reasonable and necessary to protect the Cardmember's choice of which Card to use and that charge and credit Cards, including corporate Cards, are interchangeable. You are jointly and severally liable for the obligations of your Establishments under this Agreement.

**b.** Communicating Payment Methods. Whenever you communicate the payment methods you accept to customers, you must indicate your acceptance of the Card and display our Marks (including any Card application forms we may provide you) according to our guidelines and as prominently and in the same manner as any other charge, credit, debit, stored value or smart cards, account access devices, or other payment cards, services, or products (collectively, *Other Payment Products*).

**c.** Conduct with Cardmembers. You must not (i) try to dissuade Cardmembers from using the Card; (ii) criticize or mischaracterize the Card or any of our services or programs; (iii) try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check); (iv) impose any restrictions, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products; or (v) promote any Other Payment Products (except your own card that you issue for use solely at your Establishments) more actively than you promote the Card.

**d.** Other Conduct. You must not (i) engage in activities that harm our business or brand; or (ii) indicate or imply that you prefer, directly or indirectly, any Other Payment Products over the Card.

**e.** Prohibited Uses. You must not accept the Card for: (i) damages, losses, penalties, or fines of any kind; (ii) costs or fees over the normal price of your goods or services (plus applicable taxes) or Charges that Cardmembers have not specifically approved; (iii) overdue amounts, or amounts covering returned or stop-payment checks; (iv) gambling services (including online gambling), gambling chips, or gambling credits; or lottery tickets; (v) adult digital content sold via Internet Electronic Delivery Transactions; (vi) cash; (vii) sales made by third parties or entities conducting business in industries other than yours; (viii) amounts that do not represent bona fide sales of goods or

21144 H (11/07)
US

**Exhibit A - Page 3 of 17**

Case 16-30406-rld11   Doc 8   Filed 02/05/16

services at your Establishments, e.g., purchases at your Establishments by your owners (or their family members) or employees contrived for cash flow purposes; (ix) illegal business transactions; or (x) other items of which we notify you. You must not use the Card to verify your customer's age.

## 3. SUBMITTING CHARGES AND CREDITS TO US

a. **Currency and Charge Submissions.** Your Establishments in the United States, Puerto Rico, the U.S. Virgin Islands, and other U.S. territories must submit Charges and Credits in U.S. dollars. Your Establishments in Canada must submit Charges and Credits in Canadian dollars. You must submit all Charges to us within seven days of the date they are incurred, provided that you must wait to submit Charges until after you have shipped the goods or provided the services to the Cardmember.

b. **Credit Submissions.** You must submit Credits to us within seven days of determining that a Credit is due and create a record of Credit that complies with our requirements (*Credit Record*). You must not issue a Credit when there is no corresponding Charge. We will deduct the full amount of the Credit from our payment to you (or debit your Account, defined below), but if we cannot, then you must pay us promptly upon receipt of our invoice. You must submit all Charges and Credits under the Establishment Number of the Establishment where the Charge or Credit originated.

c. **Credit to Card Account.** You must issue Credits to the Card account used to make the original purchase, unless it was made with a *Prepaid Card* (meaning Cards marked "prepaid" or bearing such other identifier as we may notify you) that is no longer available or unless the Credit is for a gift that is being returned by someone other than the Cardmember that made the original purchase, in which case you may apply your refund policy. Charges and Credits will be deemed accepted on a given business day if processed by us before our cut off for processing Charges and Credits for that day at the relevant location.

d. **No Cash Refunds.** You must not give cash refunds to Cardmembers for goods or services they purchase on the Card, unless required by law. Your refund policy for purchases on the Card must be at least as favorable as your refund policy for purchases on Other Payment Products or other payment methods. You must disclose your refund policy to Cardmembers at the time of purchase and in compliance with applicable law.

## 4. PAYMENT FOR CHARGES

a. **Currency and Payment Amount.** We will pay you according to your payment plan in U.S. dollars for the face amount of Charges submitted from your Establishments in the United States, Puerto Rico, the U.S. Virgin Islands, and other U.S. territories **less** (i) the Discount, (ii) any amounts you owe us or our Affiliates, (iii) any amounts for which we have Chargebacks, and (iv) any Credits you submit. We will pay you according to your payment plan in Canadian dollars for the face amount of Charges submitted from your Establishments in Canada **less:** (i) - (iv) above.

b. **Discount, Fees and Discount Rate.** The Discount is the amount we charge you for accepting the Card and will be: (i) a percentage (*Discount Rate*) of the face amount of Charges you submit; or a flat transaction fee, or a combination of both; and/or (ii) a monthly flat fee (*Flat Fee*) if you meet our

21144 H (11/07)
US

requirements. Charges for which you have not obtained Authorization or that are not submitted electronically are subject to supplemental fees. Your initial Discount is indicated in this Agreement or otherwise provided to you in writing by us. In addition to your Discount, we may charge you additional fees and assessments. Schedule C lists some of our current fees and assessments. We may adjust any of these amounts and may change any other amount we charge you for accepting the Card. We may charge you different Discount Rates for Charges submitted by your Establishments that are in different industries. We will notify you of such fees and assessments and any different Discount Rates that apply to you.

c. **Corporate Purchasing Card.** If you meet the requirements in Schedule A, paragraph 1.c., we may adjust your Discount Rate for Charges made on our Corporate Purchasing Card (*CPC*). This adjustment will not apply if your Discount is a Flat Fee or a flat Prepaid Card transaction fee.

d. **Notice of Error or Omission.** You must notify us in writing of any error or omission in respect of your Discount or other fees or payments for Charges, Credits or Chargebacks within ninety days of the date of the statement containing such claimed error or omission or we will consider the statement to be conclusively settled as complete and correct in respect of such amounts.

e. **Payments in Error.** If we determine at any time that we have paid you in error, we may exercise Chargeback to recover such erroneous payment. If you receive any payment from us not owed to you under this Agreement, you must immediately notify us (by calling our telephone service center) and your Processor (meaning your intermediary that we have certified for obtaining Authorizations from and submitting Charges and Credits to us) and return such payment to us promptly. Whether or not you notify us, we have the right to withhold future payments to you or debit your Account until we fully recover the amount. We have no obligation to pay any party other than you under this Agreement.

f. **Collecting from Cardmembers.** You must not bill or collect from any Cardmember for any purchase or payment made on the Card unless we have exercised Chargeback for such Charge, you have fully paid us for such Charge, and you otherwise have the right to do so.

## 5. CHARGEBACK

a. **When Chargeback Applies.** We have Chargeback rights: (i) whenever Cardmembers bring Disputed Charges, as described in Schedule A, paragraph 5, or have rights under law to withhold payments; (ii) in cases of actual or alleged fraud relating to Charges; (iii) if you do not comply with this Agreement (including omitting any Transmission Data from Charge submissions), even if we had notice when we paid you for a Charge that you did not so comply and even if you obtained Authorization for the Charge in question; or (iv) as provided elsewhere in this Agreement.

b. **How We Chargeback.** We may Chargeback by deducting, withholding, recouping from, or offsetting against our payments to you (or debiting your Account), or we may notify you of your obligation to pay us, which you must do promptly and fully. Our

Page 2



failure to demand payment does not waive our Chargeback rights.

## 6. PROTECTIVE ACTIONS

**a.** Creating a Reserve. Regardless of any contrary provision in this Agreement, we have the right in our sole discretion to determine that it is necessary to have some security for your or any of your Affiliates' obligations to us or any of our Affiliates, under this Agreement or any Other Agreement. If we so determine, we may: (i) withhold and offset amounts from payments we otherwise would make to you under this Agreement; or (ii) require you to deposit funds with us. Such amounts or funds are called a Reserve. *Other Agreement* means any agreement other than this Agreement between: (i) you or any of your Affiliates; and (ii) us or any of our Affiliates

**b.** Trigger Events for Reserve. Some of the events that may cause us to establish a Reserve include: (i) your ceasing a substantial portion of or adversely altering your operations; (ii) your selling all or substantially all of your assets or any party acquiring 25% or more of the equity interests issued by you (other than parties currently owning 25% or more of such interests), whether through acquisition of new equity interests, previously outstanding interests, or otherwise; (iii) your suffering a material adverse change in your business; (iv) your becoming insolvent; (v) our receiving a disproportionate number or amount of Disputed Charges at your Establishments; or (vi) our reasonable belief that you will not be able to perform your obligations under this Agreement, under any Other Agreement, or to Cardmembers.

**c.** Setting-Up a Reserve. If an event leads us to believe that we need to create a Reserve, then we may immediately establish a Reserve or terminate this Agreement. We will inform you if we establish a Reserve. We may increase the amount of the Reserve at any time as long as the amount of the Reserve will not exceed an amount sufficient, in our reasonable judgment, to satisfy any financial exposure or risk to us under this Agreement (including from Charges submitted by you for goods or services not yet received by Cardmembers) or to us or our Affiliates under any Other Agreement, or to Cardmembers.

**d.** Other Protections. We may deduct and withhold from, and recoup and offset against, the Reserve any amounts you or any of your Affiliates owe us or any of our Affiliates under this Agreement or any Other Agreement. We may take other reasonable actions to protect our rights or those of any of our Affiliates, including changing the speed or method of payment for Charges, exercising Immediate Chargeback, or charging you fees for Disputed Charges.

**e.** Providing Information. You must provide to us promptly, upon request, information about your finances and operations, including your most recent certified financial statements.

## 7. NOTICES

**a.** Delivery and Receipt. Unless otherwise explicitly provided for herein, all notices hereunder must be in writing and sent by hand delivery; or by United States postal service, such as first class mail or third class mail, postage prepaid; or by expedited mail courier service; or by electronic mail (*e-mail*); or by facsimile transmission, to the addresses set out below. Notices will be deemed received and effective as follows: If hand-delivered, upon delivery; if sent by e-mail or

facsimile transmission, upon sending; if mailed, upon the earlier of (i) receipt or (ii) three days after being deposited in the mail if mailed by first class or ten days after being deposited in the mail if mailed by third class. If the addressee provided for below rejects or otherwise refuses to accept the notice, or if the notice cannot be delivered because of a change in address for which no notice was appropriately given, then notice is effective upon the rejection, refusal or inability to deliver.

**b.** Our Notice Address. Unless we notify you otherwise, you will send notices to us at:

American Express Travel Related Services Company, Inc.
P.O. Box 53773
Phoenix, AZ 85072
Attn: Department 87
E-mail:
American.Express.Contract.Keying@aexp.com
Fax: (602) 744-8413
Tel: (800) 528-5200

**c.** Your Notice Address. We will send notice to you at the address, e-mail address, or facsimile number you indicated on your application to accept the Card. You must notify us immediately of any change in your notice address.

## 8. INDEMNIFICATION AND LIMITATION OF LIABILITY

**a.** Indemnity. You will indemnify, defend, and hold harmless us and our Affiliates, successors, assigns, and third party licensees, from and against all damages, liabilities, losses, costs, and expenses, including legal fees, arising or alleged to have arisen from your breach, negligent or wrongful act or omission, failure to perform under this Agreement, or failure in the provision of your goods or services.

**b.** Limitation of Liability. In no event will we or our Affiliates, successors, or assigns be liable to you for any incidental, indirect, speculative, consequential, special, punitive, or exemplary damages of any kind (whether based in contract, tort, including negligence, strict liability, fraud, or otherwise, or statutes, regulations, or any other theory) arising out of or in connection with this Agreement, even if advised of such potential damages. Neither you nor we will be responsible to the other for damages arising from delays or problems caused by telecommunications carriers or the banking system, except that our rights to create Reserves and exercise Chargebacks will not be impaired by such events.

## 9. TERM AND TERMINATION

**a.** Effective Date/Termination Date. This Agreement begins as of the date (i) you first accept the Card after receipt of this Agreement or otherwise indicate your intention to be bound by this Agreement or (ii) we approve your application to accept the Card, whichever occurs first. Either party can terminate this Agreement without cause at any time by notifying the other party. Termination will take effect according to the notice period specified in Section 7 above.

**b.** Grounds for Termination. In addition to our rights in Section 9.a. above, we can terminate this Agreement at any time without notice to you and without waiving our other rights and remedies if you have not submitted a Charge within any twelve

21144 H (11/07)
US

month period. This Agreement is a contract to extend financial accommodations, and if bankruptcy or similar proceedings are filed with respect to your business, then this Agreement will terminate automatically.

c.  Post-Termination. If this Agreement terminates, without waiving our other rights and remedies, we may withhold from you any payments until we have fully recovered all amounts owing to us and our Affiliates. If any amounts remain unpaid, then you and your successors and permitted assigns will remain liable for such amounts and will pay us within thirty days of request. You must also remove all displays of our Marks, return our materials and equipment immediately, and submit to us any Charges and Credits incurred prior to termination.

d.  Surviving Provisions. The terms of all of Sections 1, 5, 6, 8, 9, 10, and 11 and paragraphs 1.b., 1.h., 5, and 6 of Schedule A will survive termination of this Agreement. Our right of direct access to the Account will also survive until such time as all credits and debits permitted by this Agreement, and relating to transactions prior to the effective date of termination, have been made.

10.  DISPUTE RESOLUTION

a.  Arbitration Rights. All Claims arising out of or in connection with this Agreement will be resolved, upon your or our election, through arbitration pursuant to this section rather than by litigation. *Claim* means any claim (including initial claims, counterclaims, cross-claims, and third party claims), dispute, or controversy between you and us arising from or relating to this Agreement, or the relationship resulting from this Agreement, whether based in contract, tort (including negligence, strict liability, fraud, or otherwise), statutes, regulations, or any other theory, including any question relating to the existence, validity or termination of the Agreement.

b.  Arbitration Rules/Organizations. The party asserting the Claim will select one of the following arbitration organizations, which will apply its rules in effect at the time the Claim is filed. In the event of an inconsistency between this section and any rule or procedure of the arbitration organization, this section will control. The party asserting the Claim will simultaneously notify the other party of its selection. If our selection is not acceptable to you, then you may select another of the following organizations within thirty days after you receive notice of our initial selection. Any arbitration hearing that you attend will take place in the federal judicial district where your headquarters is located.

- National Arbitration Forum (*NAF*); P.O. Box 50191, Minneapolis, MN 55404-0191; (800) 474-2371; www.arbitration-forum.com
- American Arbitration Association (*AAA*): 335 Madison Avenue, New York, NY 10017; (800) 778-7879; www.adr.org

c.  Limitation of Rights. IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO ENGAGE IN PRE-ARBITRATION DISCOVERY EXCEPT AS PROVIDED FOR IN THE RULES OR PROCEDURES OF NAF OR AAA, AS APPLICABLE.

21144 H (11/07)
US

FURTHER, YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM. NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IN COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION. NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT AND WITHOUT WAIVING EITHER PARTY'S RIGHT TO APPEAL SUCH DECISION, SHOULD ANY PORTION OF THIS "LIMITATION OF RIGHTS" SECTION OR OF SECTION 10.d. BELOW BE DEEMED INVALID OR UNENFORCEABLE, THEN THE ENTIRE DISPUTE RESOLUTION SECTION 10 (OTHER THAN THIS SENTENCE) SHALL NOT APPLY.

d.  Individually Named Parties Only. All parties to the arbitration must be individually named. There will be no right or authority for any Claims to be arbitrated or litigated on a class-action or consolidated basis, on behalf of the general public or other parties, or joined or consolidated with claims of other parties, and you and we are specifically barred from doing so. This prohibition is intended to, and does, preclude any trade association or other organization from arbitrating any Claim on a representative basis on behalf of the organization's members. The arbitrator's authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator's authority to make awards is limited to awards to you and us alone.

e.  Application of Provision. For the avoidance of any confusion, and not to limit its scope, this Dispute Resolution provision applies to any putative class action lawsuit that has been filed against us prior to the effective date of this Agreement relating to the "Honor All Cards," "non-discrimination," or "no steering" provisions of this Agreement as described in Sections 1 and 2, or prior versions of a card acceptance agreement.

f.  Equitable Relief. The arbitrator will have the power and authority to grant equitable relief (e.g., injunction, specific performance) and, cumulative with all other remedies, will grant specific performance whenever possible. The arbitrator will have no power or authority to alter this Agreement or any of its separate provisions, including this Dispute Resolution section, nor to determine any matter or make any award except as provided in this section.

g.  Small-Claims Court. We will not elect to use arbitration under this section for any individual Claim that you properly file in a small claims court so long as the Claim is pending only in that court. Injunctive relief sought to enforce the confidentiality provisions of this Agreement will not be subject to the requirements of this section. This section is not intended to, and does not, substitute for our ordinary business practices, policies, and procedures, including our rights to Chargeback and to create Reserves.

h.  Governing Law/Appeal/Entry of Judgment. This section is made pursuant to a transaction involving interstate commerce and will be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16 (*FAA*). The arbitrator will apply New York law and applicable statutes of limitations, honor claims of privilege recognized by law and, at the timely request of either party, provide a written and reasoned opinion explaining his or her decision. The arbitrator will apply the rules of the arbitration organization

Page 4

Case 16-30406-rld11    Doc 8    Filed 02/05/16



selected, as applicable to matters relating to evidence and discovery, not the federal or any state rules of civil procedure or rules of evidence. The arbitrator's decision will be final and binding, except for any rights of appeal provided by the FAA or if the amount of the award exceeds US$100,000, either party can appeal that award to a three-arbitrator panel administered by NAF or AAA, as applicable, which will reconsider de novo any aspect of the initial award requested by majority vote and whose decision will be final and binding. The decision of that three person panel may be appealed as provided by the FAA. The costs of such an appeal will be borne by the appellant regardless of the outcome of the appeal. The arbitration proceeding and all testimony, filings, documents, and any information relating to or presented during the proceedings will be deemed to be confidential information not to be disclosed to any other party. Judgment upon the award rendered by the arbitrator may be entered in any state or federal court in the federal judicial district where your headquarters or your assets are located.

i.   Confidential Proceedings. All offers, promises, conduct, and statements, whether written or oral, made in the course of the negotiations, arbitrations, and proceedings to confirm arbitration awards by either party, its agents, employees, experts or attorneys, or by the arbitrator, including any arbitration award or judgment related thereto, are confidential, privileged, and inadmissible for any purpose, including impeachment or estoppel, in any other litigation or proceeding involving any of the parties or non-parties, provided that evidence that is otherwise admissible or discoverable will not be rendered inadmissible or non-discoverable as a result of its use in the negotiation or arbitration.

j.   Split Proceedings for Equitable Relief. Either you or we may seek equitable relief in arbitration prior to arbitration on the merits to preserve the status quo pending completion of such process. This section may be enforced by any court of competent jurisdiction, and the party seeking enforcement will be entitled to an award of all costs, including legal fees, to be paid by the party against whom enforcement is ordered. Except as otherwise provided in Section 10.c. above, if any portion of this DISPUTE RESOLUTION Section 10 (other than Section 10.c. or d.) is deemed invalid or unenforceable, it shall not invalidate the remaining portions of this DISPUTE RESOLUTION Section 10, this Agreement or any predecessor agreement you may have had with us, each of which shall be enforceable regardless of such invalidity.

11.  MISCELLANEOUS
a.   Confidentiality. You must keep confidential and not disclose to any third party the terms of this Agreement and any information that you receive from us that is not publicly available.

b.   Proprietary Rights and Permitted Uses. Neither party has any rights in the other party's Marks, nor may one party use the other party's Marks without its prior written consent, except that we may use your name, address, (including your website addresses or URLs), and customer service telephone numbers in any media at any time. Additionally, you may not issue any press release or make any public announcement about this Agreement or us without our prior written consent. Any information about Cardmembers and Card transactions, including the names, addresses, account numbers and Card

Identification Numbers (CIDs) (collectively, *Cardmember Information*) are confidential and our and/or our third party licensees' sole property. Except as otherwise specified, you must not disclose Cardmember Information, nor use it other than to facilitate Card transactions in accordance with this Agreement.

c.   Your Representations and Warranties. You represent and warrant to us that: (i) you are duly qualified and licensed to do business in all jurisdictions in which you conduct business; (ii) you have full authority and all necessary assets and liquidity to perform your obligations and pay your debts hereunder as they become due; (iii) there is no circumstance threatened or pending that might have a material adverse effect on your business or your ability to perform your obligations or pay your debts hereunder; (iv) you are authorized to enter into this Agreement on behalf of your Establishments and Affiliates, including those indicated in this Agreement, and the individual who signs this Agreement or otherwise enters into it has authority to bind you and them to it; (v) you are not listed on the United States Department of Treasury, Office of Foreign Assets Control, Specially Designated Nationals List; (vi) you have not assigned to any third party any payments due to you under this Agreement; (vii) all information that you provided in connection with this Agreement is true, accurate, and complete; and (viii) you have read this Agreement and kept a copy for your file. If any of your representations or warranties in this Agreement becomes untrue, inaccurate, or incomplete at any time, we may immediately terminate this Agreement in our discretion.

d.   Compliance with Laws. You will comply with all applicable laws, regulations, and rules.

e.   Governing Law; Jurisdiction. This Agreement is governed by and will be construed according to the laws of the State of New York without regard to internal principles of conflicts of law. Subject to Section 10, any action by either party will be brought in the appropriate federal or state court located in the County and State of New York. Each party consents to the exclusive jurisdiction of such court and waives any claim of lack of jurisdiction or forum non conveniens.

f.   Interpretation. In construing this Agreement, unless the context requires otherwise: (i) the singular includes the plural and vice versa; (ii) the term "or" is not exclusive; (iii) the term "including" means "including, but not limited to;" (iv) the term "day" means "calendar day"; (v) any reference to any agreement (including this Agreement), instrument, contract, policy, procedure, or other document refers to it as amended, supplemented, modified, suspended, replaced, restated, or novated from time to time; and (vi) all captions, headings, and similar terms are for reference only.

g.   Assignment. You may not assign this Agreement without our prior written consent. We may assign this Agreement to our Affiliates without your consent. Except as otherwise specified herein, this Agreement binds, and inures to the benefit of, the parties and their respective successors and permitted assigns.

h.   Waiver; Cumulative Rights. Either party's failure to exercise any of its rights under this Agreement, its delay in enforcing any right, or its waiver of its rights

21144 H (11/07)
US

on any occasion, will not constitute a waiver of such rights on any other occasion. No course of dealing by either party in exercising any of its rights will constitute a waiver thereof. No waiver of any term of this Agreement will be effective unless it is in writing and signed by the party against whom the waiver is sought to be enforced. All rights and remedies of the parties are cumulative, not alternative.

i. **Savings Clause.** If any term of this Agreement is held by a court of competent jurisdiction to be illegal or unenforceable, that term will be replaced by an enforceable term most closely reflecting the parties' intentions, with the balance of the Agreement remaining unaffected.

j. **Amendments.** We may change this Agreement at any time (including by amending any of its terms, adding new terms, or deleting or modifying existing terms) on at least ten days' prior notice to you.

k. **Entire Agreement.** This Agreement is the entire agreement between you and us regarding the subject matter hereof and supersedes any previous agreements, understandings, or courses of dealing regarding the subject matter hereof.

l. **Verification and Disclosure of Information.** We obtain information about you, including your taxpayer identification number, from your Application to accept the Card and from other sources, e.g., credit reporting agencies and providers of business information. We may request from consumer or commercial credit reporting agencies or other investigative agencies an investigative or consumer report about the commercial or personal finances of you, any person signing the Application/Set Up page of this Agreement, if applicable, and any person providing us with permission to obtain such information in connection with this Agreement. You authorize and direct us to inform such persons directly, or through yourself, of reports about such persons that we have requested from such persons. Such information will include the name and address of the agency furnishing the report. We may, at our sole discretion, disclose information about you and/or any person signing the Application/Set Up page of this Agreement, if applicable and/or any person providing us with permission to obtain or disclose information in connection with this Agreement, hereby release and waive any right or claim arising out of or related to such disclosure, including defamation claims, even if the information that we disclose is incorrect or incomplete. You acknowledge that we may report your business name and the name of your principals to the MATCH listing maintained by MasterCard and accessed and updated by Visa and American Express. You hereby specifically consent to the reporting and you hereby waive and hold us harmless from all claims and liabilities you may have as a result of such reporting.

m. **No Third-Party Beneficiaries.** This Agreement

does not and is not intended to confer any rights or benefits on any person that is not a party hereto and none of the provisions of this Agreement will be enforceable by any person other than the parties hereto, their successors and permitted assigns..

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

By

William H Glenn, President
Global Establishment Services and
Gobal Merchant Group

Schedule A
Operational and Other Procedures

**1. CHARGE RECORDS**
a. **Format.** For every Charge, you must create an electronically reproducible record of Charge (*Charge Record*) containing the following information (*Card Data*): (i) Cardmember name and full Card account number, if permitted by applicable law, and expiration date via an imprinter or other point of sale equipment or systems; (ii) the date the Charge was incurred, (iii) the amount of the Charge that must be the total price for the purchase of the goods or services plus applicable taxes and gratuities purchased on the Card; (iv) the six-digit Authorization approval code number; (v) a mutually acceptable description of the goods or services purchased by the Cardmember; (vi) an imprint or other registration of your name, address, Establishment Number and, if applicable, store number; (vii) the Cardmember's signature; (viii) the words "No Refunds" if you have a no refund policy; and (ix) all other information as required from time to time by us or applicable law. You may create multiple Charge Records for a single purchase placed on different Cards, but you must not create multiple Charge Records for a single purchase to the same Card, by dividing the purchase into more than one Charge.

b. **Retaining Documents.** You must retain the original Charge Record or Credit Record (as applicable) and all documents evidencing the transaction, or reproducible records thereof, for twenty-four months from the later of the date you submitted the corresponding Charge or Credit to us or the date you fully delivered the goods or services to the Cardmember. You must provide a copy of the Charge Record or Credit Record and other supporting documents to us within twenty days of our request.

c. **CPC Charges.** In order for us to adjust your Discount Rate for CPC Charges (if applicable), you must capture additional or reformatted Card Data on the Charge Record, and Transmission Data on the Transmissions, according to our specifications, including (as applicable): (i) the sales tax; (ii) the ship-to zip code; (iii) Corporate Purchasing Cardmember reference information; (iv) the name of the Corporate Purchasing Cardmember's employer; and (v) any other information requested by us or our CPC customers from time to time. You must obtain Authorization for and submit each CPC Charge to us

Page 6



electronically according to our specifications. We may modify the preceding requirements from time to time.

**d. Card Present Charges.** For Card Present Charges, you must: (i) verify that the Card is not visibly altered or mutilated; (ii) ensure that the Card is being used within any valid dates shown on its face; (iii) ensure that the account number on the face of the Card matches the account number on its back; (iv) verify that the Card is signed in the same name as the name on its face (except for Prepaid Cards that show no name on their face); (v) create a Charge Record as described above and verify: (1) that the Cardmember's name and signature on the Charge Record matches the name and signature on the Card (or, for a Prepaid Card that shows no name on its face, that the signature on the back of such Prepaid Card matches the signature on the Charge Record); and (2) that the Card account number and expiration date printed on the Charge Record matches the expiration date and account number on the Card; and (vi) obtain Authorization as described below.

**e. Card Not Present Charges - General.** For Card Not Present Charges, you must: (i) create a Charge Record as described above, except with a designation of "Mail Order," "Telephone Order," "Internet Order," or "Signature on File," as applicable, on the signature line or the appropriate electronic descriptor on the Charge Record; (ii) ask the Cardmember for his or her name as it appears on the Card, the Card account number and expiration date, the Cardmember's billing address, and the ship-to address; and (iii) obtain Authorization as described below. We have the right to Chargeback for any Card Not Present Charge that the Cardmember denies making or authorizing. We will not Chargeback for such Charges based solely upon a Cardmember claim that he or she did not receive the disputed goods if you have verified with us that the address to which the goods were shipped is the Cardmember's billing address and obtained a receipt signed by the authorized signer verifying the delivery of the goods to such address.

**f. Card Not Present Charges - Internet.** We will accept Charges for Internet Orders subject to the requirements of subsection e. above and the following additional requirements. You must: (i) not send Card Data or Transmission Data concerning any Internet Order via the Internet or any other electronic mail medium to anyone other than the Cardmember who made the Internet Order, your Processor, or us; (ii) submit all Charges for Internet Orders electronically; (iii) use any separate Establishment Numbers that we provide you for Internet Orders in all your requests for Authorization and submissions of Charges for Internet Orders; (iv) provide us with at least one month's prior written notice of any change in your Internet address; and (v) comply with any additional requirements that we may have from time to time. We will not be liable for actual or alleged fraudulent transactions over the Internet and we will have the right to Chargeback for those Charges. Additionally, if a Disputed Charge arises involving a Card Not Present Charge that is an Internet Electronic Delivery Transaction, we will exercise Immediate Chargeback for the full amount of the Charge. An Internet Order occurs when Card payment information is taken via the World Wide Web, online (usually via a website payment page), e-mail, intranet, extranet, EDI or other similar network in payment for goods or services. An *Internet Electronic Delivery Transaction* occurs when goods or services are ordered online and

electronically delivered online (e.g., images or software downloads).

**g. Unattended Terminals - CATs and Payment Kiosks.** We will accept Charges for purchases at your unattended CATs or payment kiosks subject to the requirements of subsection e. above and the following additional requirements. You must: (i) include in all requests for Authorization the full magnetic stripe data stream; (ii) flag all requests for Authorization with a CAT indicator; and (iii) follow any additional Authorization procedures that we may provide to you if you accept the Card at a CAT that is part of, or attached to, a fuel dispenser.

**h. Recurring Billing Charges.** If you offer Cardmembers the option to make recurring Charges automatically (*Recurring Billing Charges*), you must: (i) obtain the Cardmember's consent for you to bill his or her Card account before submitting the first Recurring Billing Charge, and (ii) notify Cardmembers that they can withdraw such consent at any time. The method you use to secure such consent must contain a disclosure that you may receive updated Card account information from the financial institution issuing the customers' Cards. You must retain evidence of such consent for twenty-four months from the date you submit the last Recurring Billing Charge. Before submitting a Recurring Billing Charge, you must obtain Authorization and complete a Charge Record except with the words "Signature on File," if applicable, on the signature line or the appropriate electronic descriptor on Charge Data. If this Agreement terminates for any reason, then you must notify all Cardmembers for whom you have submitted Recurring Billing Charges that you no longer accept the Card. The cancellation of a Card account constitutes immediate cancellation of that Cardmember's consent for Recurring Billing Charges. We need not notify you of such cancellation, nor will we have any liability to you arising from such cancellation. You must fulfill Cardmembers' requests that you discontinue the Recurring Billing Charges immediately and provide cancellation numbers to them. If a Card account is cancelled, or if a Cardmember withdraws consent to Recurring Billing Charges, you are responsible for arranging another form of payment (as applicable) with the Cardmember. You will permit us to establish a hyperlink from our website to your website (including its home page, payment page or its automatic/recurring billing page) and list your customer service contact information.

**2. AUTHORIZATION**

**a. Approval Code Number.** You must obtain from and submit to us a six-digit authorization approval code number (*Authorization*) for all Charges. Each Authorization request must include the full Card account number and be for the total price of your goods or services plus applicable taxes, except for a Prepaid Card that does not have sufficient funds available to cover that amount; in this event, Authorization is required only for the amount of funds used on the Prepaid Card and you may follow your policy on combining payment on Prepaid Cards with any Other Payment Products or methods of payment. If the other payment method is a Card, then this Agreement applies. Authorization does not guarantee that we will accept the Charge without exercising Chargeback, nor is it a guarantee that the person making the Charge is the Cardmember or that you will be paid.

21144 H (11/07)
US



**Exhibit A - Page 9 of 17**

Case 16-30406-rld11   Doc 8   Filed 02/05/16

b. **Thirty-Day Limit.** If you submit a Charge to us more than thirty days from the original Authorization date, you must obtain a new Authorization approval code number. For Charges of goods or services that are shipped or provided more than thirty days after an order is placed, you must obtain Authorization for the Charge at the time the order is placed and again at the time you ship or provide the goods or services to the Cardmember.

c. **Magnetic-Stripe Data.** If you process Card Present Charges electronically, you must transmit full magnetic stripe data with your Authorization request via a Card swipe through your point of sale equipment or systems. If the magnetic stripe is unreadable and you have to key-enter the transaction to obtain an Authorization, you must take a manual imprint of the Card to validate Card presence. If you do not take a manual imprint for any keyed transaction, we will have a right to Chargeback such Charge.

d. **Telephone Authorization.** If your point of sale equipment or system is unable to reach our computer authorization system for Authorization, or you do not have such equipment or systems, you must obtain Authorization for all Charges by calling us at our Authorization telephone number. We will charge you a fee, as described on Schedule C (currently sixty-five U.S. cents) for each Charge for which you request Authorization by telephone unless such failure to obtain Authorization electronically is due to the unavailability or inoperability of our computer authorization system (*Voice Authorization Fee*).

### 3. SUBMITTING CHARGES AND CREDITS ELECTRONICALLY

a. **Electronic Transmissions.** You must submit Charges and Credits electronically (*Charge Data*) over communication lines (*Transmissions*). Transmissions must comply with the specifications that we provide from time to time, including the following information (*Transmission Data*): The same as the Card Data requirements listed in Schedule A, paragraph 1.a., except for the requirements to include (i) Cardmember name, (ii) Card account expiration date, (iii) the Cardmember's signature and (iv) the words "No Refunds" if you have a no refund policy. We need not accept any non-compliant Transmissions and have the right to assess non-compliance fees as listed on Schedule C as "CAPN Non Compliance Fee." You must place additional, less, or reformatted information on Transmissions within thirty days' written notice from us. Even if you transmit Charge Data and Transmission Data electronically, you must still complete and retain Charge Records and Credit Records.

b. **Paper Submissions.** If you should, under extraordinary circumstances, submit Charges and Credits on paper, you must submit Charge Records and Credit Records in accordance with our instructions.

c. **Covered Parties.** You may retain, at your expense, a Processor (sometimes called an "Authorized Gateway Provider" in our materials) which (together with any of your other Covered Parties) you must ensure cooperates with us to enable your Card acceptance. You are responsible and liable for any problems or expenses caused by your Processor and for any fees that your Processor

charges us or that we incur as a result of your Processor's system for transmitting requests for Authorizations and Charge Data to us. We may bill you for any fees or deduct them from our payments to you. You must provide us on request with all relevant information about your Processor.

d. **Configuring Our Communications.** The above notwithstanding, if commercially reasonable and not prohibited by any of your other agreements, you will work with us to configure your card authorization, settlement, and point of sale equipment or systems to communicate directly with our systems for Authorizations and submissions of Charge Data.

### 4. PAYMENT METHOD

a. **Electronic Pay Program.** You must participate in our Electronic Pay program unless you cannot (e.g., your bank does not have access to the Federal Reserve System to receive transactions via an automated clearing house (*ACH*). We will charge you a fee as described on Schedule C (currently ninety-five U.S. cents per check), for paying you by check (*Check Fee*). If you participate in our Electronic Pay program but do not submit Charge Data electronically, we will charge you a fee as described on Schedule C (currently 0.15%-0.25% of the face amount of the Charge) (Paper ACH Fee).

b. **Payment Procedures.** We will send payments for Charges from your Establishments in the United States electronically via ACH to the demand deposit account (*Account*) you designate at a bank in the United States (*Bank*) that participates in ACH. You must provide us with your Bank's name and ABA (bank routing) number and your Account's DDA (bank account) number, and you must notify your Bank that we will have access to your Account for debiting and crediting the Account. Unless you and we agree otherwise, we will initiate ACH payment to your Account within three days (excluding Sundays and Federal Reserve holidays) after our receipt of the Charge prior to our cut-off time for receiving and processing Charges. If your payment date falls on a day that our bank is not open for processing ACH payments, we will initiate payment on the next day our bank is open for such processing. We will not be responsible for any obligations, damages, or liabilities in excess of the amount of the applicable debit, credit, or adjustment to your Account in the event that your Bank does not honor any such item or improperly applies it to your Account. You must notify us of any changes to your Bank, Account, or ACH information.

c. **Payment Plans.** You may choose from the following payment plans:

- *Three Days Payment Plan*: We initiate payment three days after we receive and process Charges.
- *Fifteen Days Payment Plan*: We initiate payment fifteen days after we receive and process Charges.
- *Thirty Days Payment Plan*: We initiate payment thirty days after we receive and process Charges.

Your initial choice of a payment plan is indicated in this Agreement or otherwise provided to us in writing. We may offer, in our discretion, other payment plans and will notify you of their terms, as applicable.

21144 H (11/07)
US



**d.** Flat Fee. If you select the Flat Fee option for paying us the Discount, you will incur the Flat Fee the first month after you are set up for Card acceptance. If we charge you a Flat Fee, we will debit your Account for such Flat Fee instead of debiting the amount corresponding to your Discount Rate. We may stop charging you a Flat Fee and start charging you a Discount Rate whenever: (i) the aggregate amount of Charges you submit to us during any consecutive twelve month period is greater than a threshold we determine (currently US$5,000); (ii) at your request; or (iii) otherwise in our discretion. We may automatically charge you a Flat Fee instead of a Discount Rate if you do not activate your account and submit Charges to us within one-hundred and fifty days after we set up your account. If we do not receive any Charges from you within any period of twelve consecutive months, we may charge you a Flat Fee instead of a Discount Rate.

**e.** Gross Pay Options. If you meet our additional requirements, you may enroll or be enrolled in one of the following options for paying us the Discount for which the Discount is not deducted from the face amount of the Charges you submit (*Gross Pay*).

- *Monthly Gross Pay Option*: We will debit your Account for the aggregated Discount for all of a month's Charges, and we may add an additional fee as described on Schedule C (currently 0.03% of the face amount of the Charge) (*Monthly Gross Pay Fee*) to your Discount Rate if the amount of Charges exceeds a threshold amount we determine.

- *Daily Gross Pay Option*: We will debit your Account separately for the Discount for Charges at the time of each of our payments to you.

Under both options, when we pay you for the face amount of Charges, we will debit your Account for (or otherwise deduct from payments) any Credits you submit and any amounts you owe us or for which we have Chargeback rights. In order to be eligible for either Gross Pay option, you must submit all Charge Data to us electronically and participate in both the Electronic Pay program and the Three Days Payment Plan, but not the Flat Fee option.

**f.** Paper Statement Fees. If you choose to receive paper statements, we may charge you a fee for each paper statement described on Schedule C (currently $4.50) (*Paper Statement Fee*).

**5. DISPUTED CHARGES**
**a.** Chargeback Rights. With respect to a Disputed Charge, (i) we have Chargeback rights, prior to contacting you, if we determine that we have sufficient information to resolve the Disputed Charge in favor of the Cardmember, or (ii) we may contact you prior to exercising Chargeback. In either case, you will have no more than 20 days after we contact you to provide to us a written response containing the information we require, including the full Card account number. We will Chargeback, or our previous decision to exercise Chargeback will remain in effect, for the amount of the Disputed Charge if, by the end of that twenty-day period, you have not fully resolved the Disputed Charge or provided us with the information requested.

**b.** Resolution of Disputed Charges. If we determine, based upon the information provided by you and the Cardmember, to resolve the Disputed Charge in the Cardmember's favor, we will Chargeback for that Disputed Charge, or our previous Chargeback will remain in effect. If we resolve the Disputed Charge in your favor, we will take no further action (if we have not previously exercised Chargeback) or we will reverse our previous Chargeback. The foregoing does not affect procedures under Immediate Chargeback or any special Chargeback (or "Full Recourse") programs that apply to you and under which you do not receive inquiries or notices regarding certain types of Charges prior to our final exercise of Chargeback.

**c.** Immediate Chargeback Program (sometimes called "Immediate Full Recourse Program" in our materials). If we receive disproportionately high numbers or amount of Disputed Charges relative to your prior history or industry standards, notwithstanding anything to the contrary in this Agreement, we may place you in our Immediate Chargeback program and/or charge you a fee as described on Schedule C (currently US$5 per Disputed Charge if you are in the Immediate Chargeback program or US$15 per Disputed Charge if you are not in the Immediate Chargeback program)(*Excessive Dispute Fee*) and/or create a Reserve.

**6. PROTECTING CARDMEMBER INFORMATION**
**a.** Standards for Protection of Information. Except as otherwise specified, you must, and you must cause your Covered Parties, to: (i) store Cardmember Information only to facilitate Card transactions in accordance with this Agreement, including in Schedule A, Section 1.b. and (ii) comply with the current Payment Card Industry Data Security Standard (*PCI Standard*, which is available at https://www.pcisecuritystandards.org/). no later than the effective date for implementing that version. You must protect all Charge Records and Credit Records retained pursuant to this Agreement in accordance with these data security provisions; you must use these records only for purposes of this Agreement and safeguard them accordingly. Your data security procedures for the Card shall be no less protective than for Other Payment Products you accept. You are liable for your Covered Parties' compliance with this section. Covered Parties means any or all of your employees, agents, representatives, subcontractors, Processors, providers of your point of sale equipment or systems or payment processing solutions, and any other party to whom you may provide Cardmember Information access in accordance with this Agreement.

**b.** Data Security Operating Policy. You further must comply with our Data Security Operating Policy, a copy of which is available at https://www.americanexpress.com/datasecurity and which we may amend from time to time. You have additional obligations under that policy based on your transaction volume, including providing to us documentation validating your compliance with the PCI Standard performed by Qualified Security Assessors or Approved Scanning Vendors (or both), as described in the policy. We have the right to assess nonvalidation fees in accordance with that policy for your failure to comply with those obligations as further described on Schedule C (*Data Security Non*

*Validation Fee*).

c. <u>Notification of Compromise</u>. You must notify us immediately if you know or suspect that Cardmember Information has been accessed or used without authorization or used other than in accordance with this Agreement. You must engage at your sole cost a third party forensic investigator to conduct a thorough audit of such data incident, or you must provide (and obtain any waivers necessary to provide) to us and our forensic investigators and auditors, on request and at your sole cost, full cooperation and access to conduct a thorough audit of such data incident. You shall provide to us all Card account numbers related to the data incident and audit reports of the data incident. You must work with us to rectify any issues arising from the data incident, including consulting with us about your communications to Cardmembers affected by the incident and providing (and obtaining any waivers necessary to provide) to us all relevant information to verify your ability to prevent future data incidents in a manner consistent with this Agreement. Audits must include forensic reviews and reports on compliance, as well as any and all information related to the incident, and they must identify the cause of the data incident and confirm whether or not you were in compliance with the PCI Standard at the time of the data incident.

d. <u>Indemnity Obligations</u>. Your indemnity obligations to us under this Agreement include, without waiving any of our other rights and remedies, liability for all fraudulent transactions related to such data incidents and all costs, fees, and expenses (including claims from third parties and all costs incurred by us or our third party licensees related to the notification of Cardmembers, cancellation and reissuance of Cards, fraud monitoring, reasonable legal fees and disbursements, and costs of investigation, litigation, settlement, judgment, interest, and penalties) that we or our third party licensees incur as a result of such data incidents *unless*: (i) you must notify us pursuant to this section; (ii) you are and were in compliance at the time of the data incident with our Data Security Operating Policy; and (iii) the data incident was not caused by the wrongful conduct of you or one of your employees or agents.

e. <u>No Representation by Us</u>. Except as otherwise specified in these data security provisions or our Data Security Operating Policy, your compliance with our Data Security Operating Policy shall not in any way relieve your indemnity obligations to us or our third party licensees under this Agreement, nor relieve or decrease your liability in any way. You are responsible at your sole expense for providing any additional data security measures that you deem necessary to protect your particular data and interests. We do not in any way represent or warrant that the measures contained in these data security provisions or our Data Security Operating Policy are sufficient or adequate to protect your particular data and interests. WE HEREBY DISCLAIM ANY AND ALL REPRESENTATIONS, WARRANTIES, AND LIABILITIES WITH RESPECT TO OUR DATA SECURITY OPERATING POLICY, THE PCI STANDARD, AND THE DESIGNATION AND PERFORMANCE OF QUALIFIED SECURITY ASSESSORS OR APPROVED SCANNING VENDORS (OR BOTH), WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

f. <u>Automated Verification</u>. Our Automated Address Verification and CID services are methods to help you mitigate the risk of fraud, but are not guarantees that a Charge will not be subject to Chargeback. You must participate in, and be certified under, our CID program if you wish to use that method.

**Schedule B**
**Special Terms And Conditions For Specific Industries**

If you conduct business in any of the following industries, you also must comply with the following provisions (as applicable):

1. WHOLESALE DISTRIBUTION/B2B.
You represent and warrant to us that your primary business is selling goods and services to other businesses, and that you are not in the Telecommunications industry.

2. LODGING
a. <u>Special Authorization Procedures</u>. When Cardmembers opt to pay for lodging stays on the Card, you must obtain Authorization at the time of check-in for the full estimated amounts of Charges based upon the room rates and the number of days that they expect to stay, plus taxes and other known ancillary amounts *(Estimated Lodging Charges)*, provided that you must not accept Prepaid Cards at check-in for purposes of Authorization or payment. You must not overestimate this amount. If you fail to obtain such Authorization for the Estimated Lodging Charge and submit the Charge, and the Cardmember fails to pay the Charge for any reason, we will have Chargeback rights for the full amount of the Charge. Upon check-out: (i) if the final Charge is no greater than the Estimated Lodging Charge plus 15% of the Estimated Lodging Charge, no further Authorization is necessary; or (ii) if the final Charge is greater than the Estimated Lodging Charge by more than 15%, you must obtain Authorization for any additional amount of the Charge that is greater than the Estimated Lodging Charge. If you fail to obtain such Authorization for the additional amount, or your request for such Authorization is declined, and the Cardmember fails to pay the Charge for any reason, we will have Chargeback rights for the amount of the Charge in excess of the Estimated Lodging Charge for which you already obtained Authorization. If Cardmembers opt to use Prepaid Cards at the time of check-out when the final Charge is known, you must obtain Authorization for the full amount of Charges to be placed on the Prepaid Card.

b. <u>Assured Reservations</u>. If you participate in our Assured Reservations program, you must accept all Cards, except Prepaid Cards, to reserve accommodations until the published check-out time on the day following the scheduled arrival date *(Assured Reservations)*. You must not accept Prepaid Cards for Assured Reservations. For each Assured Reservation, you must confirm the reservation and record the Cardmember's name and address and the Card account number and expiration date. When accepting Assured Reservations, you must advise Cardmembers that, if they do not claim the Assured Reservation or cancel it within the time specified in your stated cancellation policy, then they may be charged for one night's stay plus applicable taxes. If Cardmembers do not claim or cancel Assured Reservations, and you opt to charge the one night's stay, you must submit completed Charge Records

21144 H (11/07)
US



with the words "Assured Reservations - No Show" on the signature line or transmit the appropriate electronic descriptor on the Charge Data. If Cardmembers cancel, you must provide them with cancellation numbers and maintain records of such numbers and the dates provided. We will exercise Chargeback if Cardmembers dispute no-show Charges and you have failed to comply with the preceding requirements. If you do not honor an Assured Reservation, you must: (i) pay for a one night stay at comparable accommodations nearby; (ii) pay for transportation to the alternate location; (iii) pay for a three minute telephone call, if requested by the Cardmember; and (iv) forward all communications for the Cardmember to the alternate location. If we receive disproportionate numbers of Disputed no show Charges, you must work with us to reduce the number of disputes. If such efforts fail to reduce the number of disputes, we may exercise Immediate Chargeback.

c. CARDeposit® Program. If you participate in our CARDeposit program, to the extent you require room deposits you must accept the Card for payment of these deposits (*CARDeposits*). Only Cardmembers with billing addresses in the United States, Puerto Rico, the U.S. Virgin Islands, and other U.S. territories, and in Canada may use the Card for paying CARDeposits. A CARDeposit must not exceed the cost of a fourteen night stay plus applicable taxes. Upon arrival the Cardmember must show the Card. If the Cardmember does not have the Card, other identification must be shown. For each CARDeposit, you must follow the procedures in Schedule A, paragraph 1.e., except that you must complete the Charge Record with the word "CARDeposit" on the signature line or the appropriate electronic descriptor on Charge Data. You must also indicate on the Charge Record the scheduled arrival date. Within three business days from the date of the CARDeposit Charge, you must send the Cardmember written confirmation of the arrival and departure dates, the amount of the CARDeposit, a confirmation number, and your cancellation policy. If a CARDeposit arrival date is changed, you must send written confirmation of the change to the Cardmember within three business days. If a CARDeposit is canceled, you must send a written notice showing the cancellation number to the Cardmember within three business days. If a refund is due, you must submit a Credit Record with the words "CARDeposit Cancellation" on the signature line or the appropriate electronic descriptor on Charge Data. If you do not honor a CARDeposit you must: (i) issue a Credit for the CARDeposit; (ii) pay for comparable accommodations nearby for the duration of the original reservation (not to exceed fourteen nights) or until the original accommodations are available, whichever occurs first; (iii) pay for the Cardmember's transportation to the alternate location and for a return to the original location once each day until the original accommodations are available; and (iv) pay for one three-minute telephone call for the Cardmember to advise of the alternate location and another such call to advise of returning to the original location.

d. Emergency Check-In. If a Cardmember whose Card is lost or stolen requests check-in, you must call our toll-free authorization number, ask for an "Authorizer," request Authorization for an "Emergency Check-In," and follow the Authorizer's instructions. You may then submit a Charge Record

for the approved amount with the words "Emergency Check-In" under the Cardmember's signature or the appropriate electronic descriptor on Charge Data.

### 3. NO SIGNATURE PROGRAM

Your Establishments in the United States and Canada (but not Puerto Rico, the U.S. Virgin Islands, or other U.S. territories) that conduct business under the following merchant category codes, may participate in our No Signature program: Eating places and restaurants, quick service restaurants, fast food restaurants, automobile parking lot and garages, movie theater, sporting goods stores, commercial sports, professional sports clubs, athletic fields and sports promoters, bookstores, record stores, grocery stores and supermarkets, convenience store, miscellaneous food stores, miscellaneous and specialty retail (vending), drug store/pharmacy, news dealers and newsstands, laundry services, laundry, cleaning, dry cleaners, quick copy, reproduction and blueprinting services, car washes, video tape rental stores, taxi/limousine, local commuter/passenger transport, bus lines, tolls and bridge fees, service stations, doctors and physicians and Government post offices. Your Establishments that may participate in this program are called *Qualified Establishments*. The No Signature program applies only to Charges where the dollar value for the Charge submitted by your Qualified Establishments to us for Authorization is US$25 or less (CA$25 or less in Canada). We will not exercise Chargeback for such Charges based solely on the failure to obtain the Cardmember's signature at the point-of-sale if the Qualified Establishment transmits full magnetic stripe or encoded data with its Authorization request via a swipe of the Card through its electronic point of sale equipment or systems. We may nevertheless exercise Chargeback if: (i) the magnetic stripe is unreadable and the Qualified Establishment keys the transaction to obtain an Authorization; or (ii) if the electronic point of sale equipment or system or the Qualified Establishment's Processor fails to capture and pass full magnetic stripe or encoded data to us at the time of the Authorization request. The No Signature program does not apply to Disputed Charges involving customer service or goods and services disputes; we may exercise Chargeback on Disputed Charges involving these kinds of disputes, irrespective of whether or not the Cardmember's signature is obtained. If we receive disproportionate numbers of Disputed Charges under the No Signature program, you must work with us to reduce the number of disputes. If such efforts fail to reduce the number of disputes, we may exercise Immediate Chargeback, or we may modify or terminate the Qualified Establishment's participation in the No Signature program.

### 4. RESTAURANTS

For your Establishments conducting business in the restaurant industry, if the final restaurant Charge is no greater than the amount for which you obtained Authorization plus 20% of that amount, no further Authorization is necessary. If the final restaurant Charge is greater than the amount for which you obtained Authorization by more than 20%, you must obtain Authorization for any additional amount of the Charge that is greater than that amount.

### 5. MOTOR VEHICLE SALES

We will accept Charges for the down payment or the

entire purchase price of new and used motor vehicles only if: (a) the amount of the Charge does not exceed the total price of the motor vehicle after deduction of applicable discounts, rebates, cash down payments, and trade-in values; and (b) you obtain Authorization for the entire amount of the Charge. If the Cardmember denies making or authorizing the Charge and you have not transferred title or physical possession of the motor vehicle to the Cardmember, we will have Chargeback rights for such Charge.

#### 6. APARTMENT RENTALS

You represent and warrant to us that you are primarily in the business of renting Rental Establishments. You must provide to us a list of your Rental Establishments and notify us of any subsequent changes in the list. *Rental Establishments* means unfurnished long-term multifamily apartment rentals used as primary residences. The term Establishments includes Rental Establishments, but not vice versa. In order to qualify for the Discount Rate for Charges of rent on Rental Establishments and related security deposits and common room fees (collectively, *Rent Payments*), you must offer Recurring Billing charges for Rent Payments and actively promote acceptance of the Card (including by general communications to residents), and the majority of your Charge volume must come from Recurring Billing Charges for Rent Payments. We may charge you different Discount Rates for Charges submitted by your Establishments that are not Rental Establishments (e.g., Discount Rates for the parking lot industry will apply to Charges from parking lots operated at your Rental Establishments). We will notify you of those different Discount Rates. The prohibition in Section 2.c.iv of the Agreement against imposing restrictions, conditions, or disadvantages (e.g., fees, surcharges, "convenience" or "administrative" fees, penalties) when the Card is accepted will apply whether or not your Rental Establishments impose them on any Other Payment Products. We may use your name, addresses (including your website addresses or URLs), and telephone numbers in any media at any time to indicate that you accept the Card for Rent Payments, including Recurring Billing Charges for Rent Payments.

#### 7. VEHICLE RENTAL

a. **Special Authorization Procedures.** When Cardmembers opt to pay for vehicle rentals (not to exceed four consecutive months) on the Card, you must obtain Authorization for the full estimated amounts of Charges by multiplying the rate by the rental period reserved by the Cardmember plus any known incidentals (*Estimated Rental Charge*). You must neither overestimate this amount nor include an amount for any possible damage to or theft of the vehicle. If you wish to accept the Card for property damage to a rented vehicle, you must sign an addendum to this Agreement governing responsibility for such damages. If you fail to obtain such Authorization for the Estimated Rental Charge and submit the Charge, and the Cardmember fails to pay the Charge for any reason, we will have Chargeback rights for the full amount of the Charge. Upon return of the vehicle: (i) if the final Charge is no greater than the Estimated Rental Charge plus 15% of the Estimated Rental Charge, no further Authorization is necessary; or (ii) if the final Charge is greater than the Estimated Rental Charge by more than 15% you must obtain Authorization for any additional amount of the Charge that is greater than the Estimated

Rental Charge. If you fail to obtain such Authorization for the additional amount, or your request for such Authorization is declined, and the Cardmember fails to pay the Charge for any reason, we will have Chargeback rights for the amount of the Charge in excess of the Estimated Rental Charge for which you already obtained Authorization.

b. **Non-Compliance.** We may monitor your compliance with the preceding special Authorization procedures. If we notify you that an Establishment is not complying with these procedures, you must cure such non-compliance. If, after thirty days from the date of such notice, you continue not to comply with these procedures, then we will have Chargeback rights for the full amount of any Charges made at that Establishment during such continued non-compliance. For purposes of this provision, "non-compliance" occurs when more than 5% of either your total or any one Establishment's Authorizations do not comply with the preceding procedures.

#### 8. TELECOMMUNICATIONS

If you conduct business in the Telecommunications industry, notwithstanding anything to the contrary in this Agreement, we may exercise Immediate Chargeback for Disputed Charges involving either: (a) a Disputed Charge in an amount of US$50 or less; or (b) alleged or actual fraud, no matter what the amount of the Disputed Charge. We may adjust your Discount Rate annually based on the number of Disputed Charges submitted to us during such period. We may establish audit procedures determined in our discretion to ensure that no Charges except for Recurring Billing Charges are submitted under the Establishment Number designated for Recurring Billing Charges. The list of Affiliates that you must provide to us under Section 1.c. of the Agreement must include any entity that uses your Marks or holds itself out to the public as a member of your group of companies in the geographic area where you operate any Telecommunications services. *Telecommunications* means communications services, including personal communications services; cellular, paging, long distance, or local telephone services; Internet access services; or satellite or cable television services.

#### 9. TIMESHARES

You represent and warrant to us that you are a member of the American Resort Development Association and for at least two years you have been in the business either of selling Timeshare Units or listing Timeshare Units for sale, rental, or exchange. You will accept the Card for: (a) no more than 50% of the purchase price of an ownership interest or other annual occupancy right in a Timeshare Unit, if the aggregate amount of Charges you submit to us during any consecutive twelve month period is no more than a threshold we determine (currently US$3 million), or the full purchase price of an ownership interest or other annual occupancy right in a Timeshare Unit, if the aggregate amount of Charges you submit to us during any consecutive twelve month period exceeds that threshold; (b) membership fees to register or list a Timeshare Unit for sale, rental, or exchange; and (c) maintenance fees or annual fees associated with the Timeshare Units, subject to Schedule A, paragraph 1.h. You must not submit any Charge until you have the irrevocable right to retain the payment under applicable law and under a written agreement signed by the Cardmember. You must not accept the Card under

**Exhibit A - Page 14 of 17** 04060005450010009 LGS  LGHSDLKC·

Case 16-30406-rld11    Doc 8    Filed 02/05/16



this paragraph for campground memberships, recreational fees, or interests in real property other than Timeshare Units. *Timeshare Unit* means the exclusive right to occupy a unit in a real estate development located in the United States, Puerto Rico, the U.S. Virgin Islands, and other U.S. territories, and in Canada for vacation and resort use for a specific period of time each year.

## 10. CHARITABLE DONATIONS

You represent and warrant to us that you are a non-profit organization incorporated or registered under applicable law and recognized as an entity qualifying for tax exemption under Section 501(c)(3) of the U.S. Internal Revenue Service Code (*Code*). You must provide to us promptly, on request, documentation of such tax exempt status. You may accept the Card for charitable donations that: (a) are tax-deductible to the payor as a charitable contribution under the Code or (b) include the receipt of an item or service of value (such as a meal or admission to an event or other incentive) where at least a portion of the amount is tax-deductible to the payor as a charitable contribution under the Code. If you accept the Card for transactions that are not tax-deductible to the payor as a charitable contribution under the Code, we may charge you a different Discount Rate for such transactions.

## 11. INSURANCE

If any of your goods or services are sold or billed by Independent Agencies, then you must provide to us a list of such Independent Agencies and notify us of any subsequent changes in the list. We may use this list to conduct mailings that encourage such Independent Agencies to accept the Card. We may mention your name in such mailings, and you will provide us with a letter of endorsement or assistance as we may require. You will use your best efforts to encourage Independent Agencies to accept the Card. We acknowledge that you have no control over such Independent Agencies. From time to time, and subject to Section 2 of the Agreement, we may establish marketing campaigns that promote Card acceptance specifically at your Establishments or, generally, at insurance companies. A necessary purpose for which you submit Cardmember Information that is responsive to such marketing campaigns includes our use of that information to perform back-end analyses to determine the success of such marketing campaigns. We undertake no responsibility on your behalf for the collection or timely remittance of premiums. You will indemnify, defend, and hold harmless us and our Affiliates, successors, and assigns from and against all damages, liabilities, losses, costs, and expenses, including legal fees, to Cardmembers (or former Cardmembers) arising or alleged to have arisen from your termination or other action regarding their insurance coverage. "You" and "your" include Agencies that conduct business in the same industry. *Agency* means any entity or line of business that uses your Marks or holds itself out to the public as a member of your group of companies. *Independent Agency* means an entity or line of business that sells your and other's goods or services for which it may receive either payment or commission from you or an Agency.

## 12. AGGREGATORS

If you provide payment services on behalf of Sponsored Merchants (e.g., by submitting Charges for Internet Orders that occur at Sponsored Merchants) but are the merchant of record for payment or

customer service issues (such services, *Aggregator Services*), then you must: (a) make clear to Cardmembers at the time of sale and on Cardmembers' billing statements which entity is the seller (i.e., you or the Sponsored Merchant); (b) ensure that your name and customer service contact information prominently appear whenever Cardmembers enter or submit Card payment information to you and on any transaction record or receipt issued to them from your website or payment engine; and (c) hereby represent and warrant that you are in the business of providing Aggregator Services. The prohibitions in Sections 1.d. and 2.e.vii of the Agreement against acting on behalf of other parties will not apply to your Aggregator Services. You will provide Aggregator Services only to third parties that meet our criteria and whom we do not otherwise prohibit (as we may notify you from time to time) (*Sponsored Merchants*). You are responsible for all Charges, Credits, disputes, and other customer service issues related to transactions involving Sponsored Merchants. You must enforce, and cause Sponsored Merchants to abide by, Sections 2, 3, 8.b., 10, and 11 of the Agreement and paragraphs 1.b., 5, and 6 of Schedule A in respect of your Aggregator Services. You must provide us, promptly on request, with such information as we require about Sponsored Merchants. You must clearly disclose to Sponsored Merchants any fees you charge for your Aggregator Services, making clear that such fees are neither required nor requested by us. Notwithstanding anything contrary in the Agreement, if we disapprove any Sponsored Merchant, you must cease providing Aggregator Services to it within two business days of notice and enforce against it the post-termination provisions of Section 9 of the Agreement. We may exercise Immediate Chargeback for all Charges submitted by Sponsored Merchants. You must comply with any additional requirements, policies, or procedures of which we notify you from time to time.

## 13. CERTAIN HEALTHCARE TRANSACTIONS

The terms contained in this Section apply only to the acceptance of Healthcare Spending Cards (as defined below), and do not apply to acceptance of any other American Express Cards. In addition, the special processing and payment terms described below apply to acceptance of HealthCare Spending Cards only by certain physicians, hospitals and other medical providers as determined by us and do not apply to acceptance of HealthCare Spending Cards by, among other exceptions, dentists, orthodontists, optometrists, opticians and pharmacists (*Excepted Medical Professionals*). Acceptance of Cards, other than Healthcare Spending Cards, and acceptance of Healthcare Spending Cards by Excepted Medical Professionals, is not governed by this Section and is governed instead by the other Sections of this Agreement.

• We will support HealthCare Spending Cards and Benefits Plus Cards until December 31, 2007. These Cards will terminate as of January 1, 2008. Prior to and until midnight on December 31, 2007, you will continue to accept HealthCare Spending Cards according to the terms of this Section and will continue to accept Benefits Plus Cards as you would any other non-HealthCare Spending Card, according to the other Sections of this Agreement. Starting on January 1, 2008, we will not authorize transactions on HealthCare Spending Cards and/or on Benefits Plus Cards.

• Regarding Charges on HealthCare Spending Cards that we authorized prior to January 1, 2008 but that have not yet been

21144 H (11/07)
US

Page 13

**Exhibit A - Page 15 of 17**

Case 16-30406-rld11   Doc 8   Filed 02/05/16

paid on January 1, 2008, we will continue to pay you for such Charges according to the terms of this Section, after the insurance claim for the submitted HealthCare Spending Card Charge is approved by the HealthCare Insurance Carrier.

The following definitions shall apply to this Section:

*HealthCare Insurance Carrier* means the Cardmember's health insurance carrier associated with his/her HealthCare Spending Card.

*HealthCare Spending Card(s)* means American Express Card(s) bearing the words "HealthPay Plus," "SurePay," or such other identifier about which we may notify you. Cards bearing the words ÀBenefits PlusÍ are NOT covered by this Section and shall be accepted in accordance with the other provisions of this Agreement.

*HealthCare Spending Card Charge* means a Charge made on a HealthCare Spending Card.

a. Procedures at the Time of Transaction. At the time of providing the medical service, conduct a Charge transaction for the full "retail" price of the service (i.e., without considering your arrangement with the HealthCare Insurance Carrier) and follow all Card acceptance procedures provided in this Agreement, including but not limited to, verifying the valid dates on the face of the Card, obtaining Authorization and the Cardmember's signature on a Record of Charge, and electronically submitting the HealthCare Spending Card Charge to us. You must submit HealthCare Spending Card Charges individually for each transaction that could result in an insurance claim, and you must not combine multiple transactions (e.g., multiple office visits) into one Charge. If you are not in the HealthCare Insurance Carrier's network (*Out-Of-Network*) and you choose to not be paid in accordance with the procedures contained in b. and c. below, you may elect to ask the Cardmember for a different American Express Card or payment product.

b. Transaction is "Suspended" Until Insurance Claim Adjudication is Completed. If you are in the HealthCare Insurance Carrier's network, you must file the insurance claim in accordance with your normal procedures as soon as possible for adjudication, in

order to receive payment from us for the Charge as described in subsection c. below. We will suspend the Charge processing until adjudication is complete. If you are Out-Of-Network, if you or the Cardmember do not file an insurance claim, the Charge transaction will be reversed and we will not make payment to you under c. below.

c. If the Insurance Claim is Approved. If the insurance claim for the submitted HealthCare Card Charge is approved by the HealthCare Insurance Carrier: regardless of the "retail" amount of the HealthCare Spending Card Charge you submitted to us, we will pay you the portion of the HealthCare Spending Card Charge owed to you by the Cardmember (patient) as determined by the HealthCare

Insurance Carrier under the applicable health benefits plan (e.g., deductible), less our Discount and any other deductions permitted under this Agreement. You may also have the option to have us pay you the portion of HealthCare Spending Card Charges owed

to you by the HealthCare Insurance Carrier, other than for out-of-area or Out-Of-Network Charges. If you select this option, we will pay you the amount owed by the HealthCare Insurance Carrier only upon our receipt of payment from the HealthCare Carrier, and less our Discount. Please contact the applicable HealthCare Insurance Carrier with regard to this option. For Out-Of-Network Charges, any payment for Charges hereunder will not exceed the "reasonable and customary" amount determined by the HealthCare Insurance Carrier under the applicable health benefits plan. Payments hereunder will be made within the timeframe of your payment plan with us after we have received notice that adjudication has been completed. If adjudication is not completed within ninety days from the date of the original transaction, then we have the right to cancel the HealthCare Spending Card Charge and you will need to collect directly from the Cardmember and/or HealthCare Insurance Carrier. If, subsequent to our payment to you for a HealthCare Spending Card Charge, the HealthCare Insurance Carrier modifies its insurance claim adjudication for that Charge, then we will make the corresponding adjustment in our subsequent payments to you (or invoice you if necessary and you will pay us the invoiced amounts).

Case 16-30406-rld11   Doc 8   Filed 02/05/16



**Schedule C List of Fees**

This Schedule lists some of our current fees and assessments which we may charge you in addition to the Discount. We may adjust these amounts, change any other amount we charge you for accepting the Card, and charge additional fees and assessments from time to time.

| Fee | Description | Amount |
|---|---|---|
| CAPN Non Compliance Fee | A fee applied to any transaction submitted to us after August 31, 2007 that does not comply with our new Card Acceptance and Processing Network (CAPN) specifications. This fee applies to transactions submitted via both third party processor and/or direct to us. | $0.10-$1.00 per Charge in accordance with the applicable policy and/or communication governing CAPN |
| Check Fee | A fee for each check that we issue/create. | $0.95 per check |
| Data Security Non Validation Fee | Assessed if you do not provide us with proper documentation in accordance with the American Express Data Security Operating Policy. | $50,000-$200,000, in accordance with the Data Security Operating Policy |
| Excessive Dispute Fee | If we receive disproportionately high numbers or amounts of Disputed Charges relative to your prior history or industry standards, we may charge you a fee. | $5 per Disputed Charge if you are in the Immediate Chargeback program or $15 per Disputed Charge if you are not in the Immediate Chargeback program |
| Monthly Gross Pay Fee | If you enroll in the Monthly Gross Pay Option, we may charge this fee if the amount of Charges exceeds a threshold amount we determine. | 0.03% of the face amount of the Charge |
| Paper ACH Fee | If you participate in our Electronic Pay program but do not submit Charge Data electronically, we may charge you a fee. | 0.15%-0.25% of the face amount of the Charge |
| Paper Statement Fee | If you receive paper statements we may charge you a fee for each paper statement. | $4.50 per paper statement |
| Gateway Fee | Fees assessed by Visa or MasterCard Gateway to us for merchants who use their Gateways as their primary authorization sources (> 50% of their total authorization volume). | $0.001 per Charge |
| Voice Authorization Fee | A fee for each Charge for which you request Authorization by telephone unless failure to obtain Authorization electronically is due to the unavailability or inoperability of our computer authorization system. | $0.65 per Charge |

Exhibit A - Page 17 of 17

Case 16-30406-rld11    Doc 8    Filed 02/05/16

# EXHIBIT B

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

In re

SeaPort Airlines, Inc.,

Debtor-in-Possession.

) Case No. 16-30406-rld11
)
) ORDER AUTHORIZING DEBTOR TO ASSUME A
) CERTAIN CREDIT CARD PROCESSING
) AGREEMENT WITH AMERICAN EXPRESS
) COMPANY EFFECTIVE AS OF THE PETITION DATE

Based on Debtor's Motion for an Order Authorizing Debtor to Assume a Certain

Credit Card Processing Agreement with American Express Company Effective as of the

Petition Date (Dkt. No. ____) ("Motion") and the Court being otherwise fully advised, it is

ORDERED as follows:

1.       The Motion is granted.

2.       Debtor is deemed to have assumed the Agreement as of February 5, 2016

(the "Petition Date").

3.       American Express Company ("AMX") is authorized, in accordance with the

Agreement, to continue to hold the Deposit (as defined in the Motion) and to make

adjustments to the Deposit regardless of whether such amounts pertain to pre-petition or

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

**Exhibit B - Page 1 of 3**

post-petition transactions and to maintain the Deposit in such amount as specified under the Agreement. AMX is expressly authorized, in accordance with the Agreement, to withhold remittances otherwise payable to Debtor allowing AMX to cause the amount of the Deposit to equal the amount specified in the Agreement. Any claims of third parties to amounts due the Debtor under the Agreement are subject and subordinate to such rights.

4.     The security interest granted to AMX pursuant to the Agreement, including in the sales slips, the Deposit and any increases thereto (to the extent of the Debtor's interest, if any, in any of the foregoing), is hereby approved to secure all obligations of the Debtor to AMX under and in connection with the Agreement arising before or after the Petition Date, regardless of whether amounts held as the Deposit and any other property subject to AMX's interests pertain to pre-petition or post-petition transactions.

5.     The automatic stay of 11 U.S.C. Section 362 is hereby modified to enable AMX to perform under the Agreement and to exercise any and all contractual rights thereunder, including, without limitation, to (i) withhold amounts paid to AMX by AMX on account of sales slips submitted by the Debtor to AMX, (ii) collect fees due, (iii) adjust the Deposit as permitted by the Agreement and (iv) exercise the rights of recoupment, setoff and any other rights that may be exercised in the ordinary course of performance under the Agreement, in each case whether such actions, charges or credits relate to pre-petition or postpetition transactions.

6.     There shall be no surcharge of any collateral that secures the claims of AMX under 11 U.S.C. Sections 506 and 552 or under other applicable law.

7.     AMX is hereby granted an allowed administrative expense claim to the extent of AMX's claims under the Agreement that arise after the Petition Date, including but not limited to any cure costs payable under 11 U.S.C. § 365(b)(1); provided that in the event

Page 2 of 3 - ORDER AUTHORIZING DEBTOR TO ASSUME A CERTAIN CREDIT CARD PROCESSING AGREEMENT WITH AMERICAN EXPRESS COMPANY EFFECTIVE AS OF THE PETITION DATE

**Exhibit B - Page 2 of 3**

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

after entry of this Order the Debtor breaches or terminates the Agreement (including if this case is converted to one under Chapter 7) AMX shall not be entitled to submit an administrative claim against the Debtor asserting any rights based upon the assumption of the Agreement.

8.      Through the entry of this Order and by consenting thereto, neither Wells Fargo Bank nor the Debtor or the estate shall be deemed to have waived or relinquished any rights or claims whatsoever arising out of or related to the Agreement or other applicable law other than as provided herein.

9.      The effect of this Order shall survive the conversion, dismissal and/or closing of this case, appointment of a trustee herein, confirmation of a plan, and/or the substantive consolidation of this case with any other case or cases.

10.      Notwithstanding the possible applicability of Bankruptcy Rules 6007, 7062, 9014, any other provision of the Bankruptcy Rules, Bankruptcy Code or otherwise, this Order shall take effect immediately upon signature by this Court.

###

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

PRESENTED BY:


/s/Robert J Vanden Bos
Robert J Vanden Bos OSB #78100
Douglas R. Ricks, OSB #044026
Christopher N. Coyle, OSB #07350
VANDEN BOS & CHAPMAN, LLP
319 S.W. Washington, Suite 520
Portland, Oregon 97204
Telephone:  (503) 241-4869
Fax: (503) 241-3731

Of Attorneys for Debtor-in-Possession

**First Class Mail:**

See Attached List

**Electronic Mail:**

The foregoing was served on all CM/ECF participants through the Court's Case Management/ Electronic Case File system.

Page 3 of 3 - ORDER AUTHORIZING DEBTOR TO ASSUME A CERTAIN CREDIT CARD PROCESSING
AGREEMENT WITH AMERICAN EXPRESS COMPANY EFFECTIVE AS OF THE PETITION DATE

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

**Exhibit B - Page 3 of 3**

Case 16-30406-rld11    Doc 8    Filed 02/05/16