Robert J Vanden Bos OSB #78100
Douglas R. Ricks, OSB #044026
Christopher N. Coyle, OSB #07350
VANDEN BOS & CHAPMAN, LLP
319 S.W. Washington, Suite 520
Portland, Oregon 97204
TELEPHONE: (503) 241-4869
FAX: (503) 241-3731

Of Attorneys for Debtor-in-Possession


IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In re | ) | Case No. 16-30406-rld11 |
| | ) | |
| SeaPort Airlines, Inc., | ) | DEBTOR'S MOTION FOR AN ORDER |
| | ) | AUTHORIZING DEBTOR TO ASSUME A |
| | ) | CERTAIN CARRIER SERVICES AGREEMENT |
| | ) | WITH AIRLINE REPORTING CORPORATION |
| Debtor-in-Possession. | ) | EFFECTIVE AS OF THE PETITION DATE |

The Debtor-in-Possession, SeaPort Airlines, Inc. ("Debtor"), requests entry of an

order authorizing Debtor to assume a certain carrier services agreement with Airline

Reporting Corporation ("ARC") effective as of the Debtor's petition date (February 5, 2016)

(the "Petition Date"). The primary agreement with ARC is the carrier services agreement

dated June 15, 2015. The secondary agreements are the Agent Reporting Agreement

("ARA") which is between Debtor, ARC, and each travel agent, and the Corporate Travel

Department Reporting Agreement ("CTDRA"), which is an agreement between Debtor,

ARC, and Corporate Travel Departments (all agreements jointly hereinafter "Agreement").

In support of this Motion Debtor represents and states:

1.      On February 5, 2016 ("Petition Date"), the Debtor commenced a

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

reorganization case by the filing of a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Code").

2.  Pursuant to Sections 1107 and 1108 of the Code, the Debtor is continuing in possession of its property and is operating and managing Debtor's business as a debtor-in-possession.

3.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the standing order of reference of the District Court.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.  Debtor seeks authority to assume the CSA dated June 15, 2015 between ARC and Debtor, and the secondary ARA and CTDRA, effective as of the Petition Date (a copy of the sample form is attached as **Exhibit A** to the original Motion filed with the Court only -- Creditors may request a copy of **Exhibit A** by contacting Debtor's attorney).

5.  The Agreement is necessary in order for Debtor to maintain and process airline booking transactions conducted through third-party agencies. ARC provides accreditation and financial clearinghouse services for travel agencies in their relationships with carriers.  ARC accomplishes its function through certain contractual relationships with travel agents and carriers.  Pursuant to the Agreement, ARC provides a comprehensive set of services to agents and the Debtor that facilitate the sale of transportation and ancillary travel services.  ARC also provides auxiliary services with respect to data processing, management, and reporting that enhance the efficiency of Debtors financial and accounting functions.  The airline business is an interdependent industry based upon a network of agreements that govern virtually all aspects of air travel and airline operations. Without such an Agreement to coordinate airlines and airline services, efficient service to

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

Debtor's customers would be virtually impossible.  Disruption of the services that ARC

provides to Debtor would significantly impact Debtor's sales because a large volume of

Debtors ticket sales are made through third-party vendors and facilitated by ARC.

Continuation of ARC's distribution and settlement services is vital to the Debtor's operation.

Assumption of the Agreement at this time will avoid disruption to the most significant

means of booking by the Debtor's customers and will provide customers and other

creditors reassurance that this vital agreement for operation is securely in place.

Assumption of the Agreement as of the Petition Date is necessary to ensure continued

sales and bookings at a level necessary to sustain continued business.  The Debtor

believes that assumption of the Agreement at this time on the terms stated above is

appropriate and in the best interests of the Debtor's estate.

6.      Pursuant to Code Sections 365 and 105, Debtor requests authority to

assume the credit card processing agreement with Gravity, and pursuant to terms of the

proposed Order attached hereto as **Exhibit B**.

## BACKGROUND

7.      Debtor is an Alaska corporation with its principal place of operations in

Portland, Oregon that operates a scheduled airline in the United States out of its principal

hubs at the Portland International Airport ("PDX") and Memphis International Airport

("MEM").  A regional airline focused on connecting rural communities to the national

transportation network, Debtor operates a fleet of five (5) leased aircraft on routes with

destinations in El Dorado, Harrison and Hot Springs, Arkansas; Houston, Texas; Memphis,

Tennessee; and Pendleton and Portland, Oregon.

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

8.      Due to a change in federal regulations on pilot qualifications, small airlines like Debtor have experienced an extreme attrition in available pilots.  As such, Debtor has had to implement a new recruitment and retention plan for its pilots.

9.      However, the pilot shortage problem was far greater than Debtor could reasonably accommodate and as a result, Debtor had to cancel service to many areas for its survival.  Within the last thirty days, Debtor has had to cease flights to Sacramento, Visalia, Burbank, San Diego and Imperial, California, as well as North Bend, Oregon (effective March 20, 2016); Salina and Great Bend, Kansas; Kansas City, Missouri; and San Felipe, Baja California in Mexico.

10.      As a result of the foregoing events, Debtor has seen a drastic reduction in its revenues and is unable to meet its current liquidity needs.  In order to implement its planned reorganization, Debtor requires stability with its current revenue streams and payment systems.  For that reason Debtor seeks approval of this Motion.

## THE AGREEMENT WITH ARC

11.      The Debtor derives a substantial portion of its annual passenger ticket booking through third party vendors and sales agencies.  The ability of the Debtor to continue to work with traditional and online vendors and agencies is vital to its ongoing business operations.  In order to be in a position to continue a similar level of booking, the Debtor must be party to this Agreement or similar agreements with a party that can provide the services to facilitate third-party bookings and coordination of travel services.  The Debtor's Agreement with ARC is a carrier services agreement which satisfies this requirement.

12.      Under the Agreement, ARC provides a comprehensive set of services to

DEBTOR'S MOTION FOR AN ORDER AUTHORIZING DEBTOR TO ASSUME A CERTAIN CARRIER SERVICES AGREEMENT WITH AIRLINE REPORTING CORPORATION EFFECTIVE AS OF THE PETITION DATE

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

agents and the Debtor that facilitate the sale of transportation and ancillary travel services. ARC also provides auxiliary services with respect to data processing, management, and reporting that enhance the efficience of Debtors financial and accounting functions. Disruption of the services that ARC provides to Debtor would significantly impact Debtor's sales because a large volume of Debtor's sales and bookings are made through third-vendors and facilitated by ARC.  Continuation of ARC's services is vital to the Debtor's operation.  Both the Debtor and the ARC Agreement at this time will avoid disruption to the most significant means of booking by the Debtor's customers and will provide customers and other creditors reassurance that this vital agreement for operation is securely in place. Assumption of the Agreement as of the Petition Date is necessary to ensure continued sales and bookings at a level necessary to sustain continued business.

## RELIEF REQUESTED

13.    The Debtor seeks an order authorizing assumption of the Agreement pursuant to Section 365 of the Bankruptcy Code effective as of the Petition Date.  As set forth above, carrier services are critical for Debtor's ability to work with third-party sales agencies for reservations and bookings.  Without a carrier services agreement to facilitate, coordinate, and track third-party sales transactions, the Debtor would suffer a fatal competitive disadvantage and be unable to maintain any reasonable level of services.  The continuation of the Agreement with ARC is essential to the preservation of the going concern value of the Debtor and to provide assurances to the Debtor's customers and creditors that this vital contract is not in danger of termination.  Upon assumption of the Agreement by Debtor, ARC will continue to provide such services to Carrier under the Agreement, including the processing of transactions, and including, but not limited to, cash

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

refunds for all outstanding validated transactions issued by ARC-accredited entities for sales or refunds, cash or credit, or other adjustments.  ARC currently holds Debtor's funds for transactions and commissions recovered in connection with credit sales, which will be used to pay cash refunds ("Standing Reserve").  Debtor requests ARC be entitled to retain possession of the Standing Reserve until all claims for refunds are processed.

14.     The Debtor has explored options with respect to entering into a carrier services arrangement with other providers.  However, switching vendors comes with significant time and expense.  The Debtor does not believe that it would be able to obtain a processing agreement within a short period of time that would contain terms as favorable as provided by the Agreement.

15.     Debtor requests that ARC consent to the assumption but without limitation or waiver of any claims, rights or remedies arising or incurred prior to or on the termination or breach of the Agreement, including, without limitation, chargeback rights and other rights and claims related to services provided by ARC prior to termination or breach, and such rights or claims will be entitled to administrative expense priority except to the extent provided in the previous sentence.

16.     The Debtor is not in default under the Agreement.  Therefore, there are no out of the ordinary costs associated with the assumption of the Agreement.

17.     The Debtor asserts that assumption of the Agreement, as modified, at this time is appropriate and in the best interest of its estate. Counsel for ARC has specifically approved the form of this Motion and Proposed Order submitted herewith.

18.     In other Chapter 11 cases involving debtors in the passenger airline business that rely on carrier services, particularly to facilitate credit card sales, courts have routinely

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

granted the debtor authorization to assume their agreements with carrier services companies upon the commencement of a chapter 11 case.  See, e.g., In re Hawaiian Airlines, Inc., Case No. 03-00817 (Bankr. Haw. Mar. 21, 2003); In re UAL Corp., et al., Case No. 02-48191 (Bankr. N.D. Ill. Dec. 9, 2002); In re US Airways Group, Inc., et al., Case No. 02-83984 (Bankr. E.D. Va. Aug. 11, 2002); In re Trans World Airways, Inc., Case No. 01-00056 (Bankr. D. Del. Jan. 12, 2001).

WHEREFORE, the Debtor requests an order authorizing the Debtor's assumption of the Agreement as described herein and pursuant to the proposed Order submitted herewith and for such further relief as the Court deems just and proper.

Respectfully submitted;

VANDEN BOS & CHAPMAN, LLP


By:/s/Robert J Vanden Bos
    Robert J Vanden Bos, OSB #78100
    Douglas R. Ricks, OSB #044026
    Christopher N. Coyle, OSB #07350
    Of Attorneys for Debtor-in-Possession

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869



# Memorandum of Agreement
# to the
# Carrier Services Agreement

Airlines Reporting Corporation (ARC) and the Carrier named below agree to be bound by the terms of the Carrier Services Agreement, which is incorporated by reference as though fully set forth in this Memorandum.

This Carrier Services Agreement is effective as of _____,20__.
(ARC enters effective date)

The representative signing this Memorandum of Agreement on behalf of the Carrier represents and warrants that he/she is authorized to execute the Carrier Services Agreement on behalf of Carrier. *Faxed and scanned signatures shall constitute original signatures and shall be treated with the same force and effect as original signatures.*

Agreed to by:

_____          **AIRLINES REPORTING CORPORATION**
(CARRIER)
_____
Carrier three digit code number)

By:_____          By:_____
   (Signature of  authorized officer)                         (Signature of  authorized officer)


_____          _____
         Print Name and Title                                     Print Name and Title


_____          _____

Attest:_____          Attest:_____
     (Name and title of person signing)                       (Name and title of person signing)


              **Corporate Seal**                                      **Corporate Seal**

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 1 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



# Table of Contents

Part I: Definitions ........................................................................................................................... 3

Part II: Scope, Use and Effective Date of This Agreement .......................................................... 4

Part III: Carrier Acknowledgements Under this Agreement .......................................................... 5

Part IV: Cash Reserve Requirement, Financial Instrument and Financial Standards for ARC Carriers ......... 5

Part V: Agent Appointments, Terminations and Reinstatements ................................................. 9

Part VI: ARC Traffic Documents and ARC Settlement Plan ......................................................... 9

Part VII: Carrier Claims and Sharing of Recoveries, Fees and Expenses .................................. 10

Part VIII: Lost, Stolen, Counterfeit, Missing, or Altered ARC Traffic Documents ....................... 11

Part IX: ARC Tools and Online Services ..................................................................................... 12

Part X: Data Security Measures ................................................................................................. 13

Part XI: Fees and Charges .......................................................................................................... 13

Part XII: Indemnification and Contribution ................................................................................. 14

Part XIII: Amendments ................................................................................................................ 16

Part XIV: Carrier Termination of Agreement .............................................................................. 16

Part XV: ARC Suspension and Termination of Carrier Agreement ............................................ 17

Part XVI: Disputes and Arbitration ............................................................................................. 18

Part XVII: Notices ....................................................................................................................... 19

Part XVIII: Additional Consideration .......................................................................................... 20

Part XIX: Conflict of Laws ........................................................................................................... 20

Part XX: Power of Attorney ......................................................................................................... 20

Part XXI: Memorandum of Agreement ....................................................................................... 21

Part XXII: Severability ................................................................................................................. 21

Part: XXIII: Authorization to Use Data ........................................................................................ 21

Part XXIV: Waiver ....................................................................................................................... 22

Part XXV: Force Majeure ............................................................................................................ 22

Part XXVI: Transfer of Agreement .............................................................................................. 22

Attachment A: Use of ARC Online Services and Tools .............................................................. 23

Supplemental Agreement 1: Supplementary Agreement with Indirect Air Carrier ..................... 26

Supplemental Agreement 2: Supplementary Agreement of Non-Stockholder Carrier ............... 30

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 2 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16


**Carrier Services Agreement**

The parties to this Carrier Services Agreement ("Agreement" or "CSA") are the Carrier identified on the CSA Memorandum of Agreement ("Carrier") and the Airlines Reporting Corporation ("ARC") headquartered in Arlington, VA.

This Agreement covers services offered by ARC for the processing and settlement of ARC Traffic Documents and other Transactions issued by ARC-accredited Agents ("Agents") on behalf of Carrier. It also addresses the rights and obligations of the parties to this Agreement.

In consideration of these statements and the mutual covenants and agreements that follow, the parties acknowledge, understand and agree:

## Part I: Definitions

For the purposes of the agreement:

1. AGENT means any Entity accredited by ARC to issue ARC Traffic Documents. Unless otherwise stated in this Agreement, the term Agent also includes ARC-accredited Corporate Travel Departments (CTDs), Sovereign Entity Agents (SEAs) and Sovereign Entity CTDs (SECTDs). See the *Manual for Carriers for details on the Entity types*.

2. AGREEMENT(s) means the ARC Carrier Services Agreement (CSA).

3. APPOINTMENT means the methods Carrier may select for approving Agents:

   3.1. GENERAL CONCURRENCE means Carrier's authorization to ARC to appoint all Agents and its Agent locations on Carrier's behalf.

   3.2. SPECIFIC APPOINTMENT means Carrier individually appoints an Agent and its Agent Locations. Neither Agent nor any of its Agent Locations is authorized to issue ARC Traffic Documents without Carrier's direct authority.

4. ARC AGENCY LIST means the list owned and maintained by ARC, which includes the name, address and ARC code number used to identify each Location that has been accredited by ARC.

5. ARC SETTLEMENT PLAN (ASP) means the system through which Agents report and settle ARC Traffic Documents and other Transactions on behalf of carriers.

6. ARC TRAFFIC DOCUMENT means all industry standard forms and documents (paper and electronic) that ARC may provide to Agent, in trust, and for which Agent is responsible. This term includes Carrier's own traffic documents provided to ARC for processing, reporting, settlement and administration under the terms of the applicable Reporting Agreement.

7. CARRIER means any airline, railroad or other Entity that provides transportation services and: (1) has appointed a resident agent subject to the service of process within the United States; (2) is authorized by the government of any nation to engage in passenger transportation; and (3) has executed the Carrier Services Agreement with ARC, or is otherwise authorized by ARC, to participate in ARC programs and services. Carriers participate in ARC through one of ARC's Carrier participation programs, each of which is described more fully in the *Manual for Carriers*. Note: In this Agreement,

---

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 3 of 31**

Case 16-30406-rld11    Doc 126    Filed 03/02/16


capitalized *Carrier* refers to the signatory of this Agreement and lowercase *carrier* refers to other ARC participating carriers.

8. CASH RESERVE REQUIREMENT (CRR) means the amount of funds Carrier must keep on reserve with ARC to promptly reimburse ARC for projected cash refunds of Transactions issued on Carrier and contained in sales reports that may be processed through the ASP.

9. ENTITY (or Entities) means an individual, corporation, partnership, association, company, firm, or any other legal organization.

10. FINANCIAL INSTRUMENT means a bond, cash deposit, irrevocable letter of credit, or other form of financial assurance acceptable to ARC to ensure Carrier's payment of outstanding debts.

11. INTERACTIVE AGENT REPORTING (IAR) means the tool provided by ARC through which Agent accesses and submits its Sales Reports.

12. LOCATION means a place of business operated by an Agent and included on the ARC Agency List.

13. MEMORANDUM OF AGREEMENT (MOA) means the Agreement signature page by which Carrier and ARC consent to be bound by the terms of this Agreement.

14. REPORTING AGREEMENTS means the separate agreements, to which Agent, Carrier and ARC are parties that provide the terms under which accredited Agents operate (such as how Agents report and settle ARC Traffic Documents). Unless otherwise stated in this Agreement, the term *Reporting Agreements* encompasses the Agent Reporting Agreement (ARA), Corporate Travel Department Reporting Agreement (CTDRA), Sovereign Entity Agent Reporting Agreement (SEARA) and Sovereign Entity CTD Reporting Agreement (SECTDRA). See *Manual for Carriers* for these Agreements.

15. SALES REPORT means the list in IAR of all Transactions issued by an Agent during the Sales Report period.

16. SYSTEM PROVIDER means a non-ARC Entity including, but not limited to, a Global Distribution System (GDS) that: (1) supplies the ticketing data required for issuing ARC Traffic Documents in the name of Carrier; and (2) facilitates the electronic transmission of Transactional Data in Agents' Sales Reports to ARC. System Providers have entered into Agreements independently with ARC and carriers in support of these service offerings.

17. TICKETING CARRIER means the Carrier in whose name an ARC Traffic Document has been validated. The term *Ticketing Carrier* may also be referred to as *Validating Carrier* or *Issuing Carrier*.

18. TRANSACTION or TRANSACTIONAL DATA means the ticketing and other information included in the Sales Report.

19. UNITED STATES means the fifty states, the District of Columbia and any U.S. territories, including, but not limited to Puerto Rico, the U.S. Virgin Islands and American Samoa.

## Part II: Scope, Use and Effective Date of This Agreement

1. This Agreement governs the terms and conditions under which ARC will provide, and Carrier will use, services related to Transactions involving the issuance of ARC Traffic Documents by Agents.

2. Carrier has executed a power of attorney (see Part XX below) authorizing ARC to, among other things, enter into Reporting Agreements for, and on behalf of, Carrier for Agents that Carrier has or may appoint as its agents.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.

**Exhibit A - Page 4 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



3. Carrier, at its sole discretion, may use ARC's processing and settlement services without the obligation to use other ARC services.

4. ARC maintains a list of Entities eligible to receive ARC Traffic Documents (ARC Agency List) and, while ARC does not warrant the accuracy of such list or the competency, integrity or financial fitness of any Agent, or Locations appearing on such list, ARC will use reasonable efforts to ensure the accuracy of the ARC Agency List.

5. ARC may, from time to time, offer Carrier optional services not provided for in this Agreement. ARC will offer these optional services to Carrier on the same fair and equal basis as they are offered to other carriers. Details on optional services are provided in the *Manual for Carriers*.

6. ARC makes its services available on a fair and equal basis.

7. This Agreement is effective on the date ARC executes the MOA with the Carrier and will continue in full force and effect until terminated according to the terms of this Agreement.

8. This Agreement incorporates the *Manual for Carriers* by reference.

## Part III: Carrier Acknowledgements Under this Agreement

1. ARC administers the ARC Settlement Plan (ASP) that encompasses the distribution and control of ARC Traffic Documents, as well as the processing and settlement services connected with the issuance of ARC Traffic Documents.

2. ARC processes applications of Entities located within the United States who wish to become Agents eligible to issue ARC Traffic Documents for and on behalf of carriers.

3. ARC maintains a list (ARC Agency List) of Agents eligible to issue ARC Traffic Documents for and on behalf of appointing carriers.

4. ARC has entered into Reporting Agreements with Agents, on its own behalf, and on behalf of carriers.

5. Agent appointments include terms and conditions applicable to the principal-agent relationship in transactions involving ARC Traffic Documents.

6. A participating carrier makes use of some or all of ARC's services, as described in a CSA and the *Manual for Carriers*, in order to compete effectively, serve the public, and realize the reliability and efficiencies afforded by using such services.

7. ARC and its affiliates may from time to time receive funds from Carrier pursuant to this Agreement, including but not limited to the CRR and any Financial Instruments required hereunder, and ARC agrees, on behalf of itself and its affiliates, that ARC and/or its affiliates shall manage such funds (less any fees due and payable from time to time to ARC and/or its affiliates) during the term of this Agreement.

## Part IV: Cash Reserve Requirement, Financial Instrument and Financial Standards for ARC Carriers

1. Cash Reserve Requirement (CRR)

    1.1. Carrier must demonstrate that it has sufficient cash reserves to promptly reimburse ARC for projected cash refunds of Transactions issued on Carrier and contained in Sales Reports that

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 5 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



may be processed through the ASP. This will be referred to as the Cash Reserve Requirement (CRR), which is equal to Carrier's gross cash sales over the most recent four (4) weeks.

1.2. Unless otherwise stated in this Agreement, Carrier is required to maintain one or more Financial Instrument(s) in an aggregate amount equal to Carrier's CRR.

1.3. The CRR will be used to cover Carrier's potentially outstanding financial obligations including, without limitation, Carrier's projected cash refunds, unpaid fees and charges.

2. Carrier Financial Instrument

2.1. Carrier may satisfy its CRR using a bond, letter of credit or cash, or any combination thereof acceptable to ARC, such acceptance not to be unreasonably withheld or delayed.

2.1.1. If Carrier elects to satisfy its CRR using a bond or letter of credit, the minimum bond or letter of credit amount shall be $30,000 USD.

2.1.2. If Carrier elects to satisfy its CRR using cash, Carrier authorizes ARC to withhold such amount from Carrier's most recent four (4) weeks of cash disbursements. If the CRR is still not met, Carrier authorizes ARC to withhold additional cash disbursements until the CRR is achieved.

2.2. Evidence of a Financial Instrument, in a form acceptable to ARC, must be submitted with Carrier's ARC application and must be maintained on file with ARC.

2.3. Carrier grants ARC a security interest in any funds held in trust by ARC to satisfy Carrier's CRR. Carrier agrees to execute all documents ARC may reasonably require to perfect ARC's security interest.

3. Carrier Financial Standards Program

3.1. The Carrier Financial Standards Program is an optional program for any carrier that has a CRR exceeding $100,000 USD and does not desire to provide ARC a Financial Instrument in the full amount of its CRR.

3.2. All Carrier notices and documentation to ARC, required under this Section, must be addressed to ARC's Chief Financial Officer according to the instructions provided in the *Manual for Carriers*.

3.3. If Carrier, or applicant to become a carrier, elects to participate in the Carrier Financial Standards Program and satisfies the program criteria referenced above, such a carrier must submit quarterly financial statements to ARC within 45 days of the end of each calendar/fiscal quarter.

3.4. If Carrier is unable to submit financial statements to ARC, Carrier may not participate in the Carrier Financial Standards Program and must maintain a Financial Instrument in the full amount of its CRR.

3.5. If Carrier submits quarterly financial statements that meet the required financial standards as described in the *Manual for Carriers*, Carrier must maintain a Financial Instrument for at least $100,000 USD.

3.6. If Carrier is prohibited by government order from releasing quarterly financial statements, Carrier must provide a Financial Instrument of $1 million USD, and submit to ARC annual financial statements within 120 days after the end of each fiscal year. Carrier's annual financial statements must meet the required financial standards as described in the *Manual for Carriers.*

4. Actions to be Taken When Cash Reserve Requirements are Not Met

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 6 of 31**

Case 16-30406-rld11     Doc 126     Filed 03/02/16



4.1. If Carrier's Financial Instrument is insufficient, expired, canceled or has been drawn upon, or Carrier fails to provide any required increase, ARC will provide notice to Carrier that ARC will withhold Carrier's cash disbursement on a weekly basis until the amount withheld is equal to either the current insufficiency or the full amount, as applicable, of the CRR required for the Carrier.

4.2. If Carrier fails to satisfy any of the following, to meet the current CRR requirement, ARC may immediately suspend processing of carrier transactions; ARC may further terminate its Agreement with Carrier no earlier than 60 days from the effective date of the suspension:

4.2.1. Provide a current Financial Instrument;

4.2.2. Provide any required increase to its CRR; or

4.2.3. Have sufficient funds available through cash disbursements to meet Carrier's CRR in a timeframe determined by ARC in its commercially reasonable judgment.

4.3. If Carrier fails to submit required financial statements in accordance with Section IV.3.3 or Section IV.3.6:

4.3.1. ARC will notify Carrier that it has three (3) business days to submit such financial statements, or a written explanation of why it has not been submitted in a timely manner.

4.3.2. If ARC does not receive the financial statements, or the written explanation fails to establish a reasonable time limit for submission, ARC will immediately withhold Carrier's cash disbursements on a weekly basis until the amount withheld, together with the existing Financial Instrument, is equal to the CRR required for the Carrier, or until the required financial statements are submitted. ARC will return the funds withheld under this Section immediately upon evidence of Carrier's compliance with the requirements of the Carrier Financial Standards Program in Sections 3 and 4.

4.4. If Carrier submits a financial statement that fails to meet the required financial standards (tests) detailed in the *Manual for Carriers* by (a) failing three of the eight tests for two consecutive quarters, or (b) failing more than three of the eight tests for any quarter, the following will apply:

4.4.1. Within five (5) business days of receipt of the financial statements, ARC will submit the financial statements confidentially to a neutral third party appointed by the ARC Board of Directors.

4.4.2. ARC will provide simultaneous notice to Carrier advising that Carrier's financial statements have been submitted to the neutral third party and outlining Carrier's rights and obligations under this Agreement.

4.5. If Carrier fails three of the eight tests for two consecutive quarters, the neutral third party will review Carrier's financial statements and make one or more of the following determinations:

4.5.1. Whether Carrier's financial position presents a sufficient risk to ARC and other carriers to warrant the imposition of corrective action, as detailed in Section IV.4.9 below; or

4.5.2. Whether Carrier will be required to submit monthly financial statements until Carrier meets the required financial standards. In such event, ARC must receive monthly statements within 15 days of the close of each month. All procedures related to quarterly statements will also apply to monthly financial statements; or

4.5.3. Whether Carrier's financial position does not present a sufficient risk to ARC and other ARC Carriers and corrective action or the filing of monthly statements is not required.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 7 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16


4.6. If Carrier fails more than three of the eight tests, there will be a presumption that corrective action, as set forth in Section IV.4.9 below, initiated by a review procedure before the neutral third party is essential. However, Carrier may dispute the presumption by submitting clear and convincing evidence of extraordinary circumstances beyond Carrier's control, such as labor disputes, grounding of aircraft or acts of God. In such event, the neutral third party may make a determination that the ratios described in the *Manual for Carriers* are invalid as measurements of sufficient cash reserves.

4.7. Carrier has the right to submit a written explanation of its position to the neutral third party and may also request an oral or evidentiary hearing before the neutral third party.

4.7.1. The explanation and request for hearing must be submitted not later than five (5) days after the date of the notice referenced in Sections 4.4.1 and 4.4.2 above.

4.7.2. The hearing will take place within seven (7) business days of the neutral third party's receipt of the request.

4.7.3. The neutral third party will be required to render a decision within three (3) business days of receipt of the Carrier's explanation or conclusion of the hearing.

4.8. If Carrier fails to provide any written explanation or to request a hearing within five (5) days from the date of notice, Carrier forfeits the right to submit a written explanation or have a hearing.

4.9. If Carrier requires corrective action, in the opinion of the neutral third party after the review procedure, Carrier will be given three options:

4.9.1. Provide evidence of a Financial Instrument in the full amount of the CRR required for Carrier, to be provided in a form acceptable to ARC within 10 days of the notice; or

4.9.2. Permit ARC to withhold Carrier's cash disbursements on a weekly basis until the amount withheld, together with its existing Financial Instrument, is equal to the CRR required for Carrier; or

4.9.3. Withdraw from participation in the ASP.

4.10. Within three (3) business days after notification of the requirement, Carrier must provide written notice to ARC of which option under IV.4.9 above Carrier selects. Failure to respond will result in ARC withholding Carrier's cash disbursements, and ARC will have the right to terminate its Agreement with Carrier.

5. CRR Reinstatement

5.1. If Carrier selected options in Section IV.4.9.1 or IV.4.9.2 of this Agreement, Carrier may request release from those requirements by submitting financial statements that meet the required financial standards described in the *Manual for Carriers*.

6. Carrier Insolvency

6.1. In the event that a Carrier becomes insolvent, files for protection under Title 11 of the United States Code (or any successor thereto) or otherwise has a receiver appointed, dissolves, liquidates or files for bankruptcy protection under any Code or statute (either in the United States or any other country), Carrier and ARC will use commercially reasonable efforts to accomplish the following:

6.1.1. Carrier and ARC will mutually agree on the amount of the appropriate cash deposit to be paid by Carrier to ARC in order for Carrier to ensure its obligations under the CSA and

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.

**Exhibit A - Page 8 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



adequately protect ARC, subject to approval by the court or other administrative agency or governing body.

6.1.2. With ARC's consent (such consent not to be unreasonably withheld or delayed), a Carrier participating in the Carrier Financial Standards Program will be excused from its obligation to file quarterly financial statements with ARC during such period of insolvency or bankruptcy protection, but will provide ARC with a courtesy copy of the monthly operating reports or any other financial documentation that Carrier may be required to file with the court, administrative agency, governing body or United States Trustee.

6.1.3. To the extent Carrier files for protection under Title 11 of the United States Code (or any successor thereto), Carrier will provide ARC written evidence of Carrier's assumption of the CSA and the Reporting Agreements (including all amendments and addenda), together with the applicable court order authorizing Carrier to assume all of its contracts and agreements with ARC, and providing adequate protection and cure amounts to ARC as may be required under Title 11 of the United States Code (or any successor thereto).

## Part V: Agent Appointments, Terminations and Reinstatements

1. Methods of Appointment

   Carrier may appoint an Agent by General Concurrence or Specific Appointment.

2. Termination and Reinstatement of Agent Appointment

   2.1. Consistent with the procedures in the applicable Reporting Agreements and the *Manual for Carriers*, the following apply:

      2.1.1. Carrier must notify ARC using ARC's revocation of authority system (CTAC), or other ARC-authorized method, to process the termination or reinstatement of Carrier's appointment of an Agent and/or Agent's Location(s).

      2.1.2. When Carrier terminates its appointment of an Agent or Agent's Location, Carrier must separately notify such Agent in writing.

      2.1.3. If Carrier elected the General Concurrence method of appointment and terminates or reinstates its appointment of Agent or Agent's Location, ARC will transmit Carrier's notices of termination and reinstatement to ARC carriers and System Providers.

      2.1.4. If Carrier elected the Specific Appointment method of appointment and terminates or reinstates its appointment of such Agent or Agent's Location, ARC will transmit Carrier's notices of termination and reinstatement to System Providers.

## Part VI: ARC Traffic Documents and ARC Settlement Plan

1. Ownership of ARC Traffic Documents

   1.1. ARC Traffic Documents remain the property of ARC until the name of a Ticketing Carrier appears on the traffic document at which time the traffic document becomes the property of the Ticketing Carrier.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 9 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



2. Reports and Settlements

   2.1. The obligations and procedures for reporting, processing and settling ARC Traffic Documents and other Transactions are contained in Reporting Agreements with Agents, the *Manual for Carriers*, the *ARC Transaction Information Exchange Standards (TIES)* manual and the *Industry Agents' Handbook*, all of which are incorporated by reference.

3. Carrier Instructions to Agents

   3.1. Any instructions or directives Carrier issues to its Agents concerning the issuance, reporting or settlement of ARC Traffic Documents and other Transactions must conform to this Agreement, except as provided in Part XIII.3 below.

   3.2. Carrier must instruct its Agents to not use the ASP in a manner that violates United States federal, state or local laws.

4. Inspection of Agent Records

   ARC may, upon its own initiative or upon Carrier request, inspect the records of Agents pertaining to transactions involving ARC Traffic Documents to determine whether Agent is in full compliance with the provisions of the appropriate Reporting Agreements. If the inspection reveals Agent has breached or is in breach of any of the Reporting Agreements, ARC will report the relevant findings to the requesting and affected carrier(s) as outlined in the applicable Reporting Agreement and the *Manual for Carriers*.

5. Demands for Payment

   5.1. When ARC determines that an Agent is subject to any of the following, resulting in funds owed to Carrier, ARC will make demand upon the Agent for resolution of non-reporting and/or payment of amounts owed:

      5.1.1. Agent has failed to submit its Sales Report; or

      5.1.2. Agent has failed to account for and include all ARC Traffic Documents issued and validated during the Sales Report period; or

      5.1.3. Agent has included an improperly reported sale, as defined in the applicable Reporting Agreement; or

      5.1.4. Agent has permitted a draft for payment of its Sales Report to be dishonored by its designated bank, in breach of the applicable Reporting Agreement.

6. Default Collection Program

   ARC's Default Collection Program establishes procedures for joint recovery action, which may include legal action, by carriers to collect monies owed from Agents for transactions issued on ARC Traffic Documents and other Transactions. (See the *Manual for Carriers* for procedures applicable to processing claims under the Default Collection Program.)

# Part VII: Carrier Claims and Sharing of Recoveries, Fees and Expenses

1. Carrier Claims

   1.1. Carrier may submit a claim to ARC against an Agent for monies due and enforceable under applicable Reporting Agreements according to procedures described in the *Manual for Carriers*.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 10 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



1.2. If an Agent is terminated, ARC will draw upon Agent's Financial Instrument on behalf of ARC and all carriers that have claims involving ARC Traffic Documents.

1.3. If, due to ARC's negligence, Agent's Financial Instrument does not provide the coverage required under the applicable Reporting Agreements to cover Carrier's claim, the resulting loss sustained by Carrier (up to the amount the required Financial Instrument should have been) will be paid to Carrier by ARC according to Section 2.1 below.

1.4. If, through no fault of ARC, Agent's Financial Instrument cannot be collected, ARC will not be liable for resulting losses to Carrier from such non-collection.

2. Sharing of Recoveries

2.1. When funds are recovered, as the result of joint recovery action taken by ARC on behalf of Carrier and other carriers, Carrier will share a percentage of the recovery equal to Carrier's percentage of the aggregate claim, after deduction of fees and expenses reasonably incurred including attorney fees, court costs and collection expenses.

3. Sharing of Fees and Expenses

3.1. When fees and expenses are incurred as a result of joint recovery action, carriers participating in any individual case or action shall be responsible for payment of such fees and expenses.

3.2. The amount due from each carrier for fees and expenses shall be prorated as a percentage of the Carrier's claim against the total claims of all carriers participating in the action, and the amount shall be deducted from the individual Carrier's cash disbursement.

3.3 ARC will notify Carrier in writing of the initiation of legal proceeding against an Agent. Carrier should notify ARC in writing, within 10 business days, of its election to not participate in the legal proceeding and ARC will no longer have authority to pursue legal claims on Carrier's behalf in that legal proceeding. Notwithstanding, any party included in the legal proceeding may withdraw at any time by giving ARC written notice of its withdrawal. Carrier remains obligated for its portion of fees and expenses incurred up to the date Carrier withdraws and any expenses related to its withdrawal.

4. Notice of Discontinuance
4.1. ARC will notify the parties participating in the joint recovery action upon the discontinuance of any joint recovery action and the reason therefore.

5. Operating Guidelines

5.1. ARC will establish operating guidelines as may be necessary to facilitate collection of such monies owed and shall so notify the parties participating in the joint recovery action of any changes.

# Part VIII: Limitation of Liability on Lost, Stolen, Counterfeit, Missing or Altered ARC Traffic Documents

This Section supersedes any inconsistent provision of any agreements addressing the limitation of liability on lost, stolen, counterfeit, missing or altered ARC Traffic Documents to which Carrier is a party.

1. Recall of Payments

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 11 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



1.1. In the event Carrier or carriers participating in the ARC ASP have not been fully reimbursed for any ARC Traffic Document issued by any any person using lost, stolen, counterfeit, missing or altered ARC Traffic Documents, the following procedures will apply:

1.1.1. Right of Carrier to Recall Payments: If Carrier is named Ticketing Carrier on such <u>ARC</u> Traffic Documents, Carrier will be entitled to recall payments made to other carriers participating in the ARC ASP for flight coupons (endorsed or unendorsed) issued for air passenger transportation.

1.1.2. Obligation of Carrier to Honor Recalls: If Carrier is not named Ticketing Carrier on such ARC Traffic Documents, but has received payment from the Ticketing Carrier for one or more coupons of the ARC Traffic Documents, the Ticketing Carrier will be entitled to recall such payment from Carrier under the same circumstances as Carrier is entitled to recall payment under Section VIII.1.1.1, above.

1.1.3. Limited to Agreement: Interline payments between carriers in ARC ASP or between participants and non-participants for transportation not included in Part VIII.1.1.1 and VIII.1.1.2 will not be subject to reimbursement under this Agreement.

2. ARC Lost/Stolen Ticket Bulletin

For purposes of this Section, the term "lost, stolen, and/or missing" means original ARC Traffic Documents that are, or have been, properly listed in ARC's Lost/Stolen Ticket Bulletin.

2.1. ARC has sole authority to determine what is considered a lost, stolen, counterfeit, missing or altered ARC Traffic Document per the Manual for Carriers.

2.2. ARC publishes notices of lost, stolen and/or missing ARC Traffic Documents in ARC's Lost/Stolen Ticket Bulletin.

2.3. ARC is not liable for any losses associated with lost, stolen, counterfeit, missing or altered ARC Traffic Documents unless due to negligence by ARC or its agents or representatives. (See *Manual for Carriers.*)

3. Terms and Procedures

3.1. The terms and procedures applicable to this Section are contained in the *Manual for Carriers* and made part of this Agreement.

## Part IX: ARC Tools and Online Services

1. ARC provides various online services through which Carrier communicates or transacts business with ARC and Agents, including the *My ARC* web portal, Document Retrieval Service (DRS), ARC Memo Manager (AMM) and Carrier Ticketing Authority Center (CTAC), collectively referred to as "ARC Tools" or "Tools." Carrier's use of and access to ARC Tools are subject to the terms of this Agreement, including  Attachment A of this Agreement , and the Terms of Use for each Tool, which are incorporated by reference in this Agreement.

2. Carrier acknowledges and agrees that any communication or business transaction with ARC through an ARC Tool, by any individual who has been granted access to the ARC Tool by Carrier's *My ARC* Primary Administrator or Tool Administrator, will be deemed to have been submitted and

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 12 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



authorized directly by the Carrier. Such submissions will have the same force and effect as if they were submitted and/or signed (where applicable) directly by Carrier's authorized representative.

## Part X: Data Security Measures

1. Security Measures. ARC and Carrier agree to implement and comply with reasonable data security measures which are intended to:

    1.1. Protect the privacy, confidentiality, integrity and availability of Transactional Data;

    1.2. Protect against accidental, unauthorized, unauthenticated or unlawful access, copying, use, processing, disclosure, alteration, transfer, loss or destruction of Transactional Data; and

    1.3. Comply with all applicable laws, rules, regulations, directives and decisions that are relevant to the handling, processing and use of Transactional Data, including for example the Payment Card Industry's Data Security Standard (PCI DSS), in accordance with this Agreement.

2. Risk Assessments. ARC and Carrier will perform comprehensive internal and external risk assessments with respect to Transactional Data annually, and may provide evidence of such upon request, including but not limited to program documentation, risk evaluation and action plans.

## Part XI: Fees and Charges

1. General Provisions

    1.1. Subject to section 1.2 below, ARC has the sole right to set the level of fees and charges to Carrier for the services ARC performs for and on behalf of Carrier.

    1.2. The level of fees and charges to Carrier will be fair and reasonable, and the same method used in assessing fees and charges to Carrier will be used for all carriers in the same participation program.

    1.3. If Carrier fails to pay fees and charges when due, ARC reserves the right to require Carrier to increase the amount of its  Financial Instrument in a form and amount acceptable to ARC, or to take action as directed in Part XV of this Agreement, up to and including termination.

2. Participation Fees

    2.1. For each participation program, Carrier must pay ARC a one-time, non-refundable joining fee.

    2.2. Carrier's joining fee will be due prior to the date Carrier executes this Agreement and when Carrier converts to another participation program, when applicable.

    2.3. Total monthly fees Carrier must pay to ARC may be comprised of the following (See *Manual for Carriers* for fee schedule):

        2.3.1. Fixed monthly charge

        2.3.2. Transaction fee based on the number of billable items processed by ARC on behalf of Carrier each month

        2.3.3. Fees based on Carrier's processing selections

        2.3.4. Fees for optional services

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 13 of 31**



3. How ARC Determines Fees and Charges

    3.1. Fees and charges are determined by the participation program in which Carrier is enrolled.

    3.2. ARC management determines the fees and charges, and reserves the right to change them at any time.

    3.3. Fees and charges for settlement and participation services, such as joining, monthly and transaction, are subject to approval by the ARC Board of Directors.

    3.4. Once fees and charges are determined and/or changed, ARC will promptly notify Carriers, but in any event no less than five (5) business days prior to effective date of such fees, charges and changes.

4. Payment of Fees and Charges

    4.1. Unless otherwise specified in this Agreement, ARC will automatically deduct fees and charges due to ARC from Carrier's cash disbursement during the month following the month Carrier incurred the fees and charges.

    4.2. If Carrier's cash disbursements are not sufficient to cover the fees and charges deducted under Section XI.4.1 above, ARC may, at its discretion, deduct the balance due from Carrier's subsequent ASP cash disbursements or bill Carrier directly for the balance due. Payments for ARC direct billings to Carrier are due upon receipt of the billing.

    4.3. The fees and charges for any optional services Carrier selects are billed directly to Carrier.

## Part XII: Indemnification and Contribution

1. ARC Indemnification Of Carrier And Its Officers, Employees and Representatives

    1.1. If any officer or employee of ARC commits an act of embezzlement or other breach of trust, including its obligations surrounding data, in the course of performing duties on behalf of ARC under this Agreement, resulting in a monetary loss to the Carrier, ARC shall indemnify and hold harmless the Carrier, and/or any of its officers, employees or representatives, for such monetary loss. ARC shall maintain a fidelity bond including all its officers and employees in an amount determined by the ARC Board of Directors to cover such losses to ARC, the Carrier and other carrier parties to this Agreement. In addition, ARC shall indemnify, defend and hold Carrier harmless, against any claim, suit or proceeding brought against Carrier resulting from, relating to or arising out of a claim that Carrier's use of services provided to Carrier by ARC under this Agreement infringes or violates the copyright, trademark, trade secret or other proprietary right of a third party, except to the extent that such claim, suit or proceeding, any alleged infringement or violation arises from Carrier's use of ARC services in a manner prohibited under this Agreement, or in combination with technology, other services or other information in a manner not reasonably anticipated by ARC.

2. Carrier Indemnification of ARC And Its Officers, Employees and Representatives

    2.1. Except for ARC's negligence or as provided in Part XII. Section 1 above, if, in the discharge of any of its duties, it becomes necessary for ARC and/or any of its officers, employees and representatives to prosecute or defend legal proceedings, including but not limited to any suit, action, governmental inquiry or investigation, the Carrier and other carrier parties to these Carrier Service Agreements will indemnify and hold harmless ARC and its officers, directors, employees,

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 14 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



and representatives, and the surety on any bond or bonds which may be required and compensate and reimburse ARC for any "Loss," including attorneys' fees, resulting from or arising out of any ARC agreement that is the subject of the proceeding. "Loss" is defined to include all damages, claims, demands, judgments, settlements, legal fees and costs, bond premiums and any other costs incident to prosecuting or defending such legal proceedings.

2.2. Under this section of the Agreement, the Carrier and other carrier parties to this Agreement are liable to ARC for their "Pro-Rated Ratio." The Pro-Rated Ratio is defined as the ratio of the total of the Carrier's fixed monthly charge and its Variable Core Services Fee to the aggregate of the Total Core Services Fees for all carriers contributing for the current budgeted unit price.

3. Contribution

3.1. The Carriers that are shareholders of ARC, as well as those carriers which are parties to this optional Agreement (See Supplement 2), will share certain liabilities in accordance with the terms of Section XII.3 of this Agreement ("Sharing Obligation").

3.2. The Sharing Obligation shall apply to any action brought against any contributing Carrier that seeks any type of damages (whether single, treble or otherwise) arising out of the operation of ARC or the provisions of the various ARC rules, regulations, practices or agreements, including but not limited to any claim arising under the antitrust laws of the United States ("Covered Contribution Claim").

3.3. Carriers agree that each carrier who is a named defendant to any action related to a Covered Contribution Claim will be responsible only for that portion of the total damages awarded (including attorney's fees and costs) or any joint settlement in lieu of damages (including costs and attorney's fees) multiplied by the Pro-Rated Ratio (as defined in Section XII. 2 above).

3.4. Carrier may defend against a Covered Contribution Claim in any manner that it reasonably may deem appropriate, including by entering into a reasonable settlement agreement at any time. Notwithstanding anything provided in such a settlement agreement, a contributing carrier that is a party to any such individual settlement will remain subject to the Sharing Obligation under Section XII.3.1 unless the plaintiff(s) with whom its settles agrees in writing that it will not assert a claim for damages that includes the individually settling carrier's share, as computed in accordance with the Pro-Rated Ratio.

3.5. If a joint settlement is agreed to by contributing carriers representing 80% of the shares, as computed in accordance with the Pro-Rated Ratio, the contributing carriers who agree to that joint settlement will not thereafter be obligated to share in any damages (including costs and attorney's fees) awarded against, or in any subsequent settlement by, a contributing carrier who refuses to agree to the joint settlement. To the extent permissible by law, all injuries and damages arising under a Covered Contribution Claim will be deemed to be a "single injury" and the Pro-Rated Ratio will be conclusively deemed the appropriate measure of any contribution damages by any Carrier.

3.6. In the event of a joint settlement, the contributing carriers who agree to the settlement will use commercially reasonable efforts to obtain plaintiff(s)' agreement not to assert a claim for damages that includes the shares of the contributing carriers who agreed to the joint settlement.

3.7. If all or any portion of the damages awarded or any joint settlement in lieu of damages are subject to the indemnification provisions of Section XII.2 above, the provisions of Section XII.2 will supersede the provisions of Section XII.3 to the extent Section XII.2 is applicable.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 15 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16


## Part XIII: Amendments

1. Carrier-Proposed Amendments

   1.1. Carrier may propose amendments to this Agreement by submitting such amendments in writing to the President and CEO of ARC for referral to the ARC Board of Directors or stockholders.

2. Authority to Amend

   2.1. The ARC Board of Directors or stockholders will be the only bodies authorized to amend this Agreement or the Reporting Agreements.

   2.2. ARC will provide Carrier with prompt notice of any amendments, and Carrier will be bound by such amendments so long as Carrier chooses to remain a party to these Agreements.

   2.3. Amendments to this Agreement or the Reporting Agreements will become effective and binding upon Carrier 60 days after adoption, unless the amendments specify a different effective date.

3. Carrier Addenda and Supplements

   3.1. Notwithstanding Part VI.3, Part XIII.1 or Part XIII.2 above, or any other provision of this Agreement, Carrier has the right to enter into separate addenda, supplements or other contracts between it and its Agents or CTDs that supplement the Reporting Agreements, and to which ARC is not a party. In the event of any conflict between such contracts and this Agreement or the Reporting Agreements, this Agreement or the Reporting Agreements shall prevail.

## Part XIV: Carrier Termination of Agreement

1. Voluntary Termination by Carrier

   1.1. Carrier may terminate its participation in this Agreement for any reason, or no reason, by giving ARC at least 60 days advance written notice prior to termination of the Agreement.

   1.2. Carrier's termination pursuant to Section 1.1 above will become effective on the Monday immediately following the end of the 60-day notice period, unless otherwise mutually agreed by the parties.

   1.3. Upon receipt of the notice of termination pursuant to Section 1.1 above, ARC will notify all Agents, Carriers and System Providers of such termination and the effective date thereof.

   1.4. Withholding of Cash Disbursements

      1.4.1. ARC may, at its sole discretion, withhold all cash disbursements to Carrier pending full satisfaction by Carrier of all financial obligations under this Agreement.

      1.4.2. ARC will release to Carrier any withheld funds remaining after payment of Carrier's obligations no sooner than 60 days after the effective date of Carrier's termination pursuant to Section 1.1 above.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 16 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



## Part XV: ARC Suspension and Termination of Carrier Agreement

1. Shortages, or Failure to Pay for Processing and Settlement Services

    1.1. If Carrier refunds exceed its CRR or the cash funds ARC is withholding, which results in a shortage, or if Carrier defaults in the performance of any material obligation of the Agreement, ARC may suspend processing of Carrier's transactions.

    1.2. If Carrier pays ARC all monies due to ARC within 30 days after Carrier's suspension and is in compliance with all other requirements of this Agreement, ARC will immediately rescind Carrier's suspension.

    1.3. If Carrier fails to pay ARC for processing and settlement services within 30 days after such monies became due, ARC may terminate Carrier's Agreement.

    1.4. ARC will promptly notify Agents, Carriers and System Providers of any suspension or termination.

    1.5. ARC may, at its sole discretion, withhold all cash disbursements to Carrier pending full satisfaction by Carrier of all financial obligations under this Agreement.

    1.6. ARC will release to Carrier any withheld funds remaining after payment of Carrier's obligations as soon as commercially reasonable but in no event shall funds be released sooner than 60 days after the effective date of Carrier's termination.

2. Termination for Other Breaches

    ARC will terminate Carrier's Agreement for any other breach of this Agreement by Carrier, after first giving Carrier a reasonable opportunity to cure such breach, and if at least two-thirds of ARC's Board of Directors vote to terminate Carrier's participation in ARC.

3. Cessation of Scheduled Passenger Service Operations

    3.1. If Carrier ceases all, or a significant portion of, its passenger service operations ARC may suspend processing of Carrier's transactions, unless Carrier provides an additional financial guarantee.

    3.2. If Carrier resumes operations, or any part thereof, within 30 days after suspension by ARC and Carrier is in good financial standing with ARC, Carrier's suspension will be rescinded.

    3.3. If Carrier fails to resume operations within 30 days after suspension, Carrier's Agreement will be terminated, unless Carrier's cessation of operations was caused by Acts of God, civil disturbance, government-mandated groundings or labor disputes.

    3.4. ARC will promptly notify Agents and System Providers of any action taken under this Section.

    3.5. ARC may, at its sole discretion, withhold all cash disbursements to Carrier pending full satisfaction by Carrier of all financial obligations under this Agreement.

    3.6. ARC will release to Carrier any withheld funds remaining after payment of Carrier's obligations no sooner than 60 days after the effective date of Carrier's termination.

4. Government Notice, Directive or Order

    4.1. ARC will suspend processing of Carrier's transactions to the extent necessary to comply with a notice, directive or order issued by an agency, division or subdivision of the United States government or any foreign government or jurisdiction.

---

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 17 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



4.2. During the period of suspension, ARC reserves the right to take any actions it deems necessary to comply with the notice, directive or order, including to cease processing Carrier's transactions and to withhold Carrier's disbursements and funds.

4.3. If the government rescinds the notice, directive or order, or permits ARC to lift the suspension, and Carrier is in good financial standing with ARC, Carrier's suspension will be rescinded.

4.4. If the government does not rescind the notice, directive or order, or permit ARC to lift the suspension, Carrier's Agreement may be terminated if necessary to comply with the notice, directive or order.

4.5. ARC will promptly notify Agents and System Providers of any action taken under this Section.

4.6. ARC may, at its sole discretion, withhold all cash disbursements to Carrier pending full satisfaction by Carrier of all financial obligations under this Agreement.

4.7. ARC will release to Carrier any withheld funds remaining after payment of Carrier's obligations no sooner than 60 days after the effective date of Carrier's termination.

5. Outstanding Obligations

5.1. Termination of this Agreement will not relieve Carrier or ARC of any obligations owed the other that were incurred when this Agreement was in effect.

6. Grant of Security Interest

Upon receipt of notice to or from Carrier under the provisions of Parts IV or XV of this Agreement, Carrier grants to ARC a security interest in any cash disbursements withheld or to be withheld and further agrees to execute any and all documents ARC deems reasonable and necessary to ensure ARC's security interest is or remains perfected.

# Part XVI: Disputes and Arbitration

1. Disputes

1.1. Carrier, other carrier parties to this Agreement and ARC agree that if a dispute arises under this Agreement, the Reporting Agreements and/or between ARC and the carriers, the parties will first make reasonable attempts to settle the dispute by mediation before initiating arbitration pursuant to Section 2. The parties further agree that their respective good faith participation in mediation is a condition precedent to pursuing arbitration.

2. Arbitration

2.1. Arbitration will be the sole and exclusive legal remedy for resolving disputes between ARC and the carriers under this Agreement and the Reporting Agreements.

2.2. If, despite their best efforts, the parties are unable to mutually resolve disputes between or among them arising from these Agreements, any party to the dispute may request arbitration.

2.3. Disputes will be resolved by an arbitrator acceptable to all parties to the dispute, and the rules and procedures of the American Arbitration Association will apply.

2.4. Unless otherwise mutually agreed to by the parties in writing, each party will submit three names of proposed arbitrators to each other within 30 days after a party requests arbitration. If after submitting these names to each other, the disputing parties are unable to agree on the

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 18 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



appointment of an arbitrator, The American Arbitration Association will be requested to select an arbitrator.

2.5. All arbitrations will be conducted in the Commonwealth of Virginia unless the parties mutually agree to another jurisdiction.

2.6. The initial cost of initiating the arbitration will be paid by the party initiating the Arbitration. All other future expenses of the arbitration, including any future fees payable to the arbitrator, will be shared equally by all parties to the arbitration. Notwithstanding this provision, nothing herein prohibits ARC from seeking its right of indemnification for any fees paid under this provision pursuant to Section XII.2 of this Agreement.

2.7. The decision of the arbitrator will be final and binding upon all parties to the dispute. Judgment on the decision rendered by the arbitrator may be entered in any court having jurisdiction thereof.

3. Legal Actions

3.1. Carrier, ARC and other carriers party to the Agreement will not bring any legal action against any party to this Agreement concerning matters covered by this Agreement, unless:

3.1.1. The legal action is to enforce an arbitrator's decision; or

3.1.2. ARC brings legal action against a terminated carrier for any unpaid amounts owed to ARC under these Agreements.

3.2. As an alternative or supplement to mediation as set forth in Part XVI.1 above and arbitration as set forth in Part XVI.2 above, Carrier or ARC, at its sole option, may obtain in any court of competent jurisdiction any injunctive relief, including without limitation temporary restraining orders and preliminary injunctions, against any acts or omissions, or threatened acts or omissions, arising under this Agreement for which no adequate remedy at law may be available or which may cause such party irreparable harm.

## Part XVII: Notices

1. Except as otherwise provided in this Agreement, any notice between ARC and Carrier that is required to be made in writing may be sent by first-class or express mail, express or overnight delivery, facsimile or e-mail.

1.1. Notices sent from Carrier to ARC are to be addressed to ARC's Carrier Participation department with a copy to ARC's General Counsel. Refer to the *Manual for Carriers* for contact details.

1.2. Notices sent from ARC to Carrier will be addressed to the most recent address provided to ARC, including counsel if such address has been provided. Carrier must notify ARC in writing of any change to Carrier's address of record and e-mail address. Failure to provide ARC with timely notification of changes to its address of record or e-mail address does not relieve Carrier of its obligations under this Agreement.

2. Any notice between ARC and Carrier that is not required to be made in writing can be delivered by any common method including those mentioned above, telephone or notice on ARC's corporate websites, such as *My ARC*.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 19 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



3. The effective date of any notices between ARC and Carrier, for the purpose of calculating any delivery requirements, will be the date the notice was mailed, e-mailed, faxed or placed in the hand of a government-licensed delivery service.

# Part XVIII: Additional Consideration

In addition to the consideration specified in this Agreement, Carrier is entering this Agreement with the understanding that other carriers that have entered into similar agreements with ARC and will comply with the terms of those Agreements. Carrier and ARC recognize these other carriers as third-party beneficiaries of this Agreement, just as Carrier is a third-party beneficiary of the other carriers' similar agreements with ARC.

# Part XIX: Conflict of Laws

This Agreement was entered into in Arlington, Va., USA, and the principal services performed by ARC for Carrier under this Agreement will occur in Virginia. The provisions of this Agreement will be construed in accordance with, and governed by, the laws of the Commonwealth of Virginia without regard to its conflict of laws principles.

# Part XX: Power of Attorney

1. The Carrier whose name and authorized signature appear on the Memorandum of Agreement for this Agreement, does hereby make, constitute and appoint ARC, a corporation duly organized under the laws of the State of Delaware, U.S.A., and having its principal place of business in Arlington, Va., United States, its true and lawful attorney-in-fact, and Carrier further makes, constitutes and appoints ARC's attorney its true and lawful attorney, each and either or both of them for it, and in its name, place and stead, to perform only the following acts in connection with this Agreement:

   1.1. To enter into Reporting Agreements with Agents that Carrier has, or hereafter may, appoint as its agent;

   1.2. To remove its appointment from any Agent and Location whenever ARC removes all ARC Traffic Documents from that Agent, or authorized Location, or whenever ARC removes an Agent or an authorized agency Location from the ARC Agency List;

   1.3. To make demand for payment upon any Agent or Location or other parties for monies owed to Carrier under the Reporting Agreement;

   1.4. To make claims against an Agent's Financial Instrument that the Agent maintains under the Reporting Agreement, including legal or other proceedings, including, but not limited to, arbitration against the surety or issuer of a bond, letter of credit or other Financial Instrument;

   1.5. To institute legal or other proceedings, including, but not limited to, arbitration involving Agents, or carrier parties to this Agreement so as to protect ARC's financial interests; and

   1.6. To participate in bankruptcy proceedings involving Agents or carrier parties to this Agreement so as to protect ARC's financial interests.

2. Giving and granting to its attorney-in-fact and attorney full power and authority to do and perform all and every act and thing whatsoever, requisite, necessary and proper to be done in the premises, as fully, to all intents and purposes, as it might or could do, with full power of substitution and

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 20 of 31**

Case 16-30406-rld11    Doc 126    Filed 03/02/16


revocation, hereby ratifying and confirming all that its attorney-in-fact and its attorney, or the substitute of either or both of them, shall lawfully do, or cause to be done, by virtue hereof.

3. Non-Power of Attorney Carrier Obligations

   3.1. ARC may also retain outside legal counsel to protect ARC's interests, as needed, including, but not limited to, in the event the Carrier becomes insolvent or files for protection under Title 11 of the United States Code, or otherwise has a receiver appointed, dissolves, liquidates or files for bankruptcy protection under any Code or statute either in the Unites States or any other country. In doing so, ARC will act consistent with its obligations under this Agreement.

   3.2. Carrier will be liable to ARC for the cost of any or all of the legal fees ARC incurred in connection with retaining outside legal counsel for any purposes recited within this section or for any other reasons necessitated within this Agreement and will remit payment for such legal fees in accordance with Section XI.4 of this Agreement.

## Part XXI: Memorandum of Agreement

ARC has prepared a Memorandum of Agreement that, when executed, binds ARC and Carrier to the terms and conditions of this Agreement and any applicable attachments and supplements. The Memorandum of Agreement will be executed in duplicate, and Carrier's copy will be attached to its copy of this Agreement, and ARC will retain the second copy.

## Part XXII: Severability

If any provision of this Agreement is held to be invalid in a court of law or equity, the remaining provisions will be construed as if the invalid provision were not included in this Agreement.

## Part: XXIII: Authorization to Use Data

1. The Carrier generated data in connection with its sale of passenger transportation and other services to the public. To the extent Carrier owns such data, Carrier grants ARC the non-exclusive right to use the data, and any other data Carrier provides directly or indirectly to ARC, solely in connection with the financial processing or other services ARC provides to, or on behalf of, Carrier, and/or in furtherance of ARC's corporate mission, as determined by its Board of Directors.

2. Alternatively, and based on whatever rights Carrier possesses to this data, Carrier grants ARC the non-exclusive right to use the data, and any other data provided directly or indirectly to ARC, solely in connection with the financial processing or other services ARC provides to, or on behalf of, Carrier, and/or in furtherance of ARC's corporate mission, as determined by its Board of Directors.

3. ARC agrees to maintain Carrier's data in strict confidence and not to release individual Carrier data except as consented to by the Carrier in writing, or, with respect to data aggregated from ARC participating carriers, as is necessary to the attainment of ARC's corporate mission, as determined by its Board of Directors.

4. ARC will have no rights in data originally ticketed after termination of this Agreement.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 21 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16


## Part XXIV: Waiver

A waiver by a party of any breach or default by the other party will not be construed as a waiver of any other breach or default whether or not similar and whether or not occurring before or after the subject breach.

## Part XXV: Force Majeure

Except for Carrier's financial obligations under this Agreement, either party may be excused for any delay or failure to perform, due to causes beyond the affected party's reasonable control.

## Part XXVI: Transfer of Agreement

This agreement is not assignable or transferable without the express prior written consent of ARC. Such consent shall not be unreasonably withheld. Upon approval of the transfer of the CSA, the surviving entity must be in compliance with all provisions of the CSA.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 22 of 31**

Case 16-30406-rld11    Doc 126    Filed 03/02/16


## Attachment A: Use of ARC Online Services and Tools

1. ARC provides various online services Carriers use to conduct business with ARC and the Carriers. Currently these Tools include ARC's Memo Manager, CTAC and Document Retrieval Service, as well as the *My ARC* web portal through which other ARC Tools are accessed.

2. Carrier's use of ARC Tools is subject to the terms of the ARA and the Terms of Use for each Tool, which are incorporated by reference. Carrier and its users may not be authorized to access all ARC Tools available. ARC reserves the right to determine who may access My ARC and other ARC Tools.

3. Carrier represents that it has computer equipment, software and Internet connection compatible for accessing *My ARC* and other ARC Tools, and that such are capable of a sufficiently high level of encryption to meet the system requirements established by ARC from time to time. Carrier must ensure the computer equipment Carrier uses to access ARC's Tools uses an industry-standard anti-virus software program capable of detecting and removing computer viruses, as well as software for protection against malware. Carrier will further ensure that such software is updated periodically in accordance with a commercially reasonable schedule.

4. ARC will assign to the Carrier Log-in Credential(s) that will allow Carrier to access *My ARC* and ARC's Tools, and will also allow Carrier to create additional Log-in Credentials.

    4.1. Log-in Credentials shall serve as the Carrier's authentication, authorization and verification of all Transactional Data and other data and information transmitted to ARC and/or the Carriers. Carrier must comply with all ARC instructions and rules concerning the Log-in Credentials that ARC provides and updates from time to time.

    4.2. Carrier's use of Log-in Credentials shall have the same force and effect as a handwritten signature, shall bind the Carrier for all purposes and shall be deemed admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Carrier agrees not to contest the validity or enforceability of electronic transactions confirmed with the Carrier's Log-in Credentials.

    4.3. All Log-in Credentials, whether created by Carrier or by ARC at the request of the Carrier, are confidential and must be maintained by the Carrier as confidential. The Carrier will not disclose its Log-in Credentials to anyone who is not authorized to act on its behalf. Disclosure of Log-in Credentials to other persons or Entities may compromise the security of confidential financial, transactional, passenger and other data provided to ARC and/or Carriers.

    4.4. Carrier assumes liability for use, misuse or unauthorized use of Carrier's Log-in Credentials supplied by ARC, whether created by the Carrier or by ARC at the request of the Carrier. Carrier must indemnify, defend and hold harmless ARC, its owners, directors, officers, employees, representatives and participating Carriers, from injury or damage to any Person, property or

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.

**Exhibit A - Page 23 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16


entity including, but not limited to, the Carrier, resulting from any such use, misuse or unauthorized use of the Carrier's Log-in Credentials**.**

4.5. Carrier will immediately notify the ARC Customer Care Center at ARC's headquarters if the Carrier believes that any one of its Log-in Credentials has been lost, stolen, misused, misappropriated or otherwise compromised. Notwithstanding the foregoing, notification to ARC will not relieve Carrier of its obligations hereunder.

5. Carrier must designate a Document Retrieval Service (DRS) Security Manager who shall perform administrative functions for the Carrier's users of DRS, including, but not limited to, creating and terminating individual DRS user accounts, DRS administrators, resetting of passwords, etc., according to instructions ARC may provide from time to time.

6. Carrier must designate a *My ARC* Primary Administrator who shall perform administrative functions for the Carrier's *My ARC* users, including, but not limited to, creating and terminating individual *My ARC* user accounts, *My ARC* administrators and Tool administrators and granting and terminating user and administrator access to *My ARC* and ARC Tools, resetting of passwords, etc., according to instructions ARC may provide from time to time.

7. Account profiles created in Tools by Carrier, its administrators, security managers or Tool users, and the information contained in the profiles, will not constitute an application for, and/or ARC approval of a change of Carrier's name, address, status, organizational structure or ownership, etc.

8. ARC's Tools and online services are provided on an "**As Is**" and "**As Available**" case-by-case basis, and are subject to necessary scheduled downtime for maintenance, unscheduled maintenance and system outages. Carrier's access to ARC's Tools and online services may be interrupted at times for maintenance, system outages and other circumstances beyond ARC's Control (e.g., telecommunications outage, etc.), including, but not limited to, those circumstances described in Section 9 below.

9. The availability of ARC's Tools is subject to interruption and delay due to causes beyond ARC's reasonable control, including, without limitation, delays by suppliers or vendors; acts of God or of a public enemy; acts of the United States or any state or political subdivision; fires, severe weather, floods, earthquakes, natural disasters, explosions or other catastrophes; and labor strikes or slowdowns (collectively, "excusable delay"). ARC will not be liable to Carrier for any excusable delay. In no event will ARC be liable for any indirect, special, punitive or consequential damages, including lost profits, even if ARC has been advised of the possibility of such damages.

10. ARC reserves the right to assess a fee, upon 30 days' notice to Carrier, for any new, modified, or enhanced services related to ARC's Tools that may be offered to the Carrier in the future. By using any new or modified features when they become available, the Carrier agrees to be bound by the rules concerning these features.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.

**Exhibit A - Page 24 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



11. The means by which ARC provides access to ARC's Tools and online services, and the format and other features of such Tools and online services, may be modified or deleted by ARC at any time upon reasonable notice to the Carrier.

12. Upon termination of the Carrier's Carrier Services Agreement or access to the ARC Tools and/or online services, the information that the Carrier would otherwise be able to access electronically or via *My ARC*, up to the termination date, may be made available to Carrier, upon written request, in the format and media (e.g., CD ROM, via an Internet website, etc.) as determined by ARC, and to the extent possible, in consultation with Carrier. ARC reserves the right to assess a fee for such service. Carrier acknowledges and agrees that nothing in this Section will affect the terms, conditions or validity of the Carrier Services Agreement.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 25 of 31**

Case 16-30406-rld11    Doc 126    Filed 03/02/16



# SUPPLEMENTARY AGREEMENT – 1

## ARC Carrier Services Agreement

## Supplementary Agreement with Indirect Air Carrier

## (Public Charter Operator)

The parties to this Supplementary Agreement ("Supplementary Agreement") are Airlines Reporting Corporation (ARC), headquartered in Arlington, Va., and Carrier identified below ("Carrier"), which is an Indirect Air Carrier as that term is defined in this Supplementary Agreement and in 14 C.F.R. Part 380 (Part 380) of the U.S. Department of Transportation (DOT) regulations.

This Supplementary Agreement modifies and supplements Carrier Services Agreement (CSA) between ARC and Carrier as stated herein. The Supplementary Agreement addresses the rights and obligations of ARC, and Carrier as an Indirect Air Carrier participating in the ARC Settlement Plan (ASP) and ARC's Indirect Air Carrier Program.

In consideration of these statements and the mutual covenants and agreements that follow, the parties agree, acknowledge and understand:

## Part I: Incorporation by Reference of ARC Carrier Services Agreement

ARC and Carrier acknowledge, affirm and agree they have each properly executed the attached Carrier Services Agreement (CSA), and that the CSA is incorporated by reference in this Supplementary Agreement, and is binding on ARC and Carrier as of the date of this Supplementary Agreement, except to the extent that the CSA is modified by the following terms and conditions of this Supplementary Agreement. Except as stated in this Supplementary Agreement, all terms of the CSA between ARC and Carrier remain in force and effect.

## Part II: Definitional Modifications

For purposes of this Supplementary Agreement, Part I of the CSA (Definitions) is modified to add the following definition:

INDIRECT AIR CARRIER or "Public Charter Operator" means an Entity which has an office, registered agent or general sales agent subject to the service of process within the United States, and is authorized by the United States Department of Transportation (DOT), by virtue of an approved Prospectus, to offer and sell air transportation as an Indirect Air Carrier or registered foreign indirect air carrier in accordance with the DOT regulation Part 380 (and any and all other DOT statute or regulation that governs Public Charter Operators), and has commenced providing air transportation of persons, or will commence providing air transportation of persons within 45 days of the date Carrier executes this Agreement.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.

**Exhibit A - Page 26 of 31**

Case 16-30406-rld11    Doc 126    Filed 03/02/16



## Part III: Purpose, Scope, Use and Effectiveness

For purposes of this Supplementary Agreement, Part II of the CSA (Scope, Use and Effective Date), is modified to add the following:

1.  DOT Authority to Act as an Indirect Air Carrier
    1.1. As a condition precedent to approval as a participating carrier in the ASP, and/or the processing of any sales or transactions by ARC, Carrier will provide to ARC the Charter Prospectus stamped-approved with an assigned "PC" number from the U.S. Department of Transportation's Special Authorities Division (herein "Prospectus") evidencing Carrier's authority to sell air transportation for specified flights as an Indirect Air Carrier. In the case of a foreign indirect air carrier, a copy of registration under Part 380 shall also be provided to ARC. Such prospectus shall demonstrate that Carrier has commenced providing air transportation of persons, or will commence providing air transportation of persons within 45 days of the date the execution of this Supplementary Agreement.

    1.2. Carrier represents and warrants that an approved Prospectus will be obtained from the U.S. Department of Transportation prior to selling, offering to sell or advertising air transportation issued on ARC Traffic Documents and/or processed through the ASP. ARC reserves the right to terminate this Supplementary Agreement if Carrier fails to provide a copy of the Prospectus and any other satisfactory written evidence of its authority or registration requested by ARC.

    1.3. Carrier represents and warrants that such approved Prospectus, and all other documents required by the DOT and other relevant government authorities, shall be made available to System Providers and Agents in accordance with U.S. Department of Transportation regulations.

2.  DOT Authority to Engage in Transaction Processing and Settlement Through ARC

Carrier represents and warrants that is in compliance with all applicable DOT regulations, including escrow requirements and depository bank requirements pertaining to passenger funds and credit card charges. Carrier is solely responsible for compliance with all such DOT regulations. ARC reserves the right to require proof of compliance with applicable DOT regulations. If Carrier fails to provide proof of compliance with DOT regulations or any other satisfactory written evidence of its authority to operate as an Indirect Carrier, ARC may terminate this Supplementary Agreement.

## Part IV: Indemnification

For purposes of this Supplementary Agreement, Part XII of the CSA (Indemnification) is modified to add the following:

Carrier will indemnify and hold harmless ARC, its officers, directors, agents and employees from all responsibility and liability for any damage, expense or loss to any person or thing, including reasonable attorney's fees and costs which ARC incurs under the discharge of ARC duties on behalf of Carrier under the CSA and this Supplementary Agreement or which is caused by or arises from any violation by Carrier, its officers, employees and representatives of the authority referenced in Section III of the Supplementary Agreement, or any statutes, laws, rules and/or regulations issued by the DOT or other authority governing Indirect Air Carriers, Public Charters and Public Charter operations.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 27 of 31**

Case 16-30406-rld11    Doc 126    Filed 03/02/16



## Part V: Amendments

For purposes of this Supplementary Agreement, Part XIII of the CSA (Amendments) is modified to the following:

ARC will promptly notify Carrier of amendments to this Supplementary Agreement and such amendments will become effective and binding upon Carrier 30 days after notice, unless the amendments specify a different effective date.

## Part VI: Termination

For purposes of this Supplementary Agreement, Part XV of the CSA (Termination of Carrier Agreement) is modified to add the following:

ARC reserves the right to terminate the Carrier Services Agreement and this Supplementary Agreement if Carrier fails to comply with any provisions of this Supplementary Agreement including Sections III.1 and 2, or is unable to comply with any other requirements for participation in the ARC ASP.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 28 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



**This Supplementary Agreement to the ARC Carrier Services Agreement is accepted and agreed to by:**

INDIRECT AIR CARRIER (PUBLIC CHARTER OPERATOR):

Legal name of Carrier

_____

By: _____
(Signature of duly authorized officer)

_____
(Name and title of person signing)

Date: _____

AIRLINES REPORTING CORPORATION

By: _____
(Signature of duly authorized officer)

_____
(Name and title of person signing)

Date:_____

_____

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 29 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



# SUPPLEMENTARY AGREEMENT – 2

## ARC Carrier Services Agreement

## Supplementary Agreement of Non-Stockholder Carrier to Become Bound to Part XII.3 of the Carrier Services Agreement

This Supplementary Agreement (SA-2), made and entered into this _____ day of _____, 20_____, by and between the Airlines Reporting Corporation ("ARC"), headquartered in Arlington, Va.,

and

_____
("Carrier", whose name appears at the end of this document)

WITNESSETH:

WHEREAS, the Carrier is a party to the ARC Carrier Services Agreement ("CSA");

WHEREAS, the CSA contains Part XII.3, entitled "Contribution," which binds all ARC stockholders and those non-stockholder carriers which choose to be so bound;

WHEREAS, the Carrier is a non-stockholder carrier which desires and chooses to bound by Part XII.3 of the CSA;

NOW, therefore, in consideration of these premises and the mutual covenants and agreements hereinafter set forth, it is mutually agreed as follows:

## I. Agreement to Be Bound

The Carrier hereby binds itself as a non-stockholder carrier to all the provisions of Part XII.3 of the CSA.

## II. Third-Party Beneficiaries

In addition to the good and valuable consideration specified in this Supplementary Agreement and Part XII.3 of the CSA, the Carrier is entering into this Agreement in consideration that other carriers bound to the provisions of Part XII.3 of the CSA will comply with the terms of those provisions. The Carrier and ARC recognize these other carriers as third party beneficiaries of this Supplementary Agreement, just as the Carrier is a third party beneficiary of the other carriers' similar agreements with ARC.

effective: June 15, 2015
© 2015 Airlines Reporting Corporation, All Rights Reserved.
**Exhibit A - Page 30 of 31**
Case 16-30406-rld11    Doc 126    Filed 03/02/16



## III. Effective Date

This Supplementary Agreement shall become effective 30 days after the date first written above, and shall only apply to legal actions initiated after the effective date hereof.

## IV. Conflict of Laws

This Supplementary Agreement was entered into in the County of Arlington, Virginia, USA, and the principal activities performed under this Agreement will occur in Arlington, Va. The provisions of this Supplementary Agreement shall be construed in accordance with, and governed by, the laws of the Commonwealth of Virginia.

IN WITNESS WHEREOF, the parties hereto have executed this Supplementary Agreement as of the date and year first above written.

_____

(Legal name of Carrier)

_____

(Signature of duly authorized officer)

ATTEST:

_____

(Print name and title of person signing)

_____

Airlines Reporting Corporation

_____

(Print name of President)

ATTEST:

_____

Corporate Secretary

_____

effective: June 15, 2015

© 2015 Airlines Reporting Corporation, All Rights Reserved.

**Exhibit A - Page 31 of 31**

Case 16-30406-rld11    Doc 126    Filed 03/02/16

# PROPOSED FORM OF ORDER

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| In re | Case No. 16-30406-rld11 |
|---|---|
| SeaPort Airlines, Inc., | ORDER AUTHORIZING DEBTOR TO ASSUME A CERTAIN CARRIER SERVICES AGREEMENT WITH AIRLINE REPORTING CORPORATION EFFECTIVE AS OF THE PETITION DATE |
| Debtor-in-Possession. | |

Based on Debtor's Motion for an Order Authorizing Debtor to Assume the Carrier

Services Agreement with Airline Reporting Corporation effective as of the Petition Date (Dkt.

No. __) ("Motion") and the Court being otherwise fully advised, it is

ORDERED as follows:

1.     The Motion is granted, and the Debtor is deemed to have assumed the Carrier

Services Agreement dated June 15, 2015 (the "CSA"), including the authority granted to

Airline Reporting Corporation ("ARC") to act on Debtor's behalf under the Reporting

Agreements, as defined in Paragraph 14 of Part I of the CSA, as of February 5, 2016 (the

"Petition Date"). The CSA and the Reporting Agreement are collectively herein the

"Agreement".

**VANDEN BOS & CHAPMAN, LLP**
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

**Exhibit B - Page 1 of 4**

Case 16-30406-rld11     Doc 126     Filed 03/02/16

2. Debtor shall comply with its Obligation under the Agreement and is entitled to the benefits thereunder. ARC is authorized, in accordance with the Agreement to continue to perform its duties and receive the benefits under the agreement, including the authority granted to ARC including processing and settling transactions (as described in the Agreement) and to transact and continue business with third-party sales agencies on Debtor's behalf, regardless of whether such action pertains to pre-petition or post-petition transactions. ARC is expressly authorized, in accordance with the Agreement, to withhold remittances and disbursements otherwise payable to Debtor allowing ARC to cause the amount of the financial instrument or cash deposit held by ARC ensuring performance to equal the amount specified in the Agreement. Any claims of third parties to amounts due the Debtor under the Agreement are subject and subordinate to such rights.

3. The security interest granted to ARC pursuant to the Agreement, including in funds held in trust by ARC, and any increases thereto (to the extent of the Debtor's interest, if any, in any of the foregoing), is hereby approved to secure all obligations of the Debtor to ARC under and in connection with the Agreement arising before or after the Petition Date, regardless of whether amounts held as the Deposit and any other property subject to ARC's interests pertain to pre-petition or post-petition transactions.

4. The automatic stay of 11 U.S.C. Section 362 is hereby modified to enable ARC to perform under the Agreement and to exercise any and all contractual rights thereunder, including, without limitation, to (i) hold amounts paid to ARC by third-party sales agencies on account of credit and debit memos submitted by third-parties, (ii) collect fees due, (iii) exercise the rights of recoupment, setoff and any other

**VANDEN BOS & CHAPMAN, LLP**
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

**Exhibit B - Page 2 of 4**

rights that may be exercised in the ordinary course of performance under the Agreement, in each case whether such actions, charges or credits relate to pre-petition or postpetition transactions.

5.      There shall be no surcharge of any collateral that secures the claims of ARC under 11 U.S.C. Sections 506 and 552 or under other applicable law.

6.      ARC is hereby granted an allowed administrative expense claim to the extent of ARC's claims under the Agreement that arise after the Petition Date, including but not limited to any cure costs payable under 11 U.S.C. § 365(b)(1).

7.      Through the entry of this Order and by consenting thereto, neither U.S. Bank nor the Debtor or the estate shall be deemed to have waived or relinquished any rights or claims whatsoever arising out of or related to the Agreement or other applicable law other than as provided herein, with respect to events or actions that occur after entry of this Order..

8.      The effect of this Order shall survive the dismissal and/or closing of this case, appointment of a Chapter 11 trustee herein, confirmation of a plan, and/or the substantive consolidation of this case with any other case or cases.

9.      Notwithstanding the possible applicability of Bankruptcy Rules 6007, 7062, 9014, any other provision of the Bankruptcy Rules, Bankruptcy Code or otherwise, this Order shall take effect immediately upon signature by this Court.


### 

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

**VANDEN BOS & CHAPMAN, LLP**
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

PRESENTED BY:

VANDEN BOS & CHAPMAN, LLP


By:/s/Robert J Vanden Bos
    Robert J Vanden Bos, OSB #78100
    Douglas R. Ricks, OSB #044026
    Christopher N. Coyle, OSB #07350

    Of Attorneys for Debtor-in-Possession

**First Class Mail:**

See Attached List.  (The original Service
List is attached to the original copy filed
with the Court only.  Creditors may request
a copy of the Service List by contacting
Debtor's attorney.)

**Electronic Mail:**

The foregoing was served on all CM/ECF
participants through the Court's Case
Management/ Electronic Case File system.

**VANDEN BOS & CHAPMAN, LLP**
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

**Exhibit B - Page 4 of 4**

<u>In re  SeaPort Airlines, Inc.;</u>
Chapter 11 Bankruptcy Case No. 16-30406-rld11


CERTIFICATE - TRUE COPY

DATE:        March 2, 2016

DOCUMENT:  DEBTOR'S MOTION FOR AN ORDER AUTHORIZING DEBTOR TO ASSUME
           A CERTAIN CARRIER SERVICES AGREEMENT WITH AIRLINE
           REPORTING CORPORATION EFFECTIVE AS OF THE PETITION DATE

        I hereby certify that I prepared the foregoing copy of the foregoing named document and
have carefully compared the same with the original thereof and it is a correct copy therefrom and
of the whole thereof.

CERTIFICATE OF SERVICE

        I hereby certify that I served a copy of the foregoing on:

SeaPort Airlines, Inc.          Olson Brooksby PC             Brandy A. Sargent
Attn:  Timothy Sieber           c/o Scott Brooksby, Esq.      STOEL RIVES LLP
7505 NE Airport Way             200 Pacific Building          900 SW 5th Ave Ste 2600
Portland, OR  97218             520 SW Yamhill Street         Portland OR  97204
                                Portland, OR 97204

JA Flight Services, LLC                                       Michael J. Edelman
c/o Bruce A. Jacobs, President                               VEDDER PRICE
Creditors Committee Chairperson  Memphis Propeller Service, Inc.  1633 Broadway
43W700 US Route 30              c/o Mark Matthews, President  47th Floor
Sugar Grove, IL 60554           11098 Willow Ridge Drive      New York, New York 10019
                                Olive Branch, MS 38654

Franklin C. Adams
POB 1025
Riverside, CA 92502-1028

by mailing a copy of the above-named document to each of them in a sealed envelope,
addressed to each of them at his or her last known address.  Said envelopes were deposited in
the Post Office at Portland, Oregon, on the below date, postage prepaid.

        I hereby certify that the foregoing was served on all CM/ECF participants through the
Court's Case Management/Electronic Case File system on the date set forth below.

        Dated:  March 2, 2016


                        VANDEN BOS & CHAPMAN, LLP


                        By:/s/Robert J Vanden Bos
                            Robert J Vanden Bos, OSB #78100
                            Douglas R. Ricks, OSB #044026
                            Christopher N. Coyle, OSB #07350
                            Of Attorneys for Debtor-in-Possession