Robert J Vanden Bos OSB #78100
Douglas R. Ricks, OSB #044026
Christopher N. Coyle, OSB #07350
Spencer C. Wilson, OSB #154498
VANDEN BOS & CHAPMAN, LLP
319 S.W. Washington, Suite 520
Portland, Oregon  97204
TELEPHONE:  (503) 241-4869
FAX: (503) 241-3731

     Of Attorneys for Debtor-in-Possession


# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In re | ) | Case No. 16-30406-rld11 |
| | ) | |
| SeaPort Airlines, Inc., | ) | DEBTOR'S MOTION FOR AN ORDER |
| | ) | AUTHORIZING DEBTOR TO ASSUME A |
| | ) | CERTAIN TELECOMMUNICATION SERVICES |
| Debtor-in-Possession. | ) | AGREEMENT WITH X5 SOLUTIONS, INC. |

The Debtor-in-Possession, SeaPort Airlines, Inc. ("Debtor"), requests entry of an

order authorizing Debtor to assume a certain telecommunication services agreement with

X5 Solutions, Inc. ("X5").  In support of this Motion Debtor represents and states:

     1.     On February 5, 2016 ("Petition Date"), the Debtor commenced a

reorganization case by the filing of a voluntary petition under Chapter 11 of the United

States Bankruptcy Code (the "Code").

     2.     Pursuant to Sections 1107 and 1108 of the Code, the Debtor is continuing in

possession of its property and is operating and managing Debtor's business as a debtor-in-

possession.

     3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b)

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

and the standing order of reference of the District Court.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.      Debtor seeks authority to assume the certain telecommunication services

agreement dated February 17, 2009, between X5 and Debtor (a copy, redacted in

accordance with FRBP 9037, of which is attached as **Exhibit A**) (the "Agreement")

effective as of the Petition Date.

5.      The Agreement is necessary in order for Debtor to maintain basic

telecommunications services. These services include local, long distance, and local access

and transport area telecommunications, and a toll-free number for the benefit of Debtor's

customers. Telecommunication services are essential to Debtors ability to communicate

with customers, vendors, service providers, and other parties with which Debtor conducts

business.  Continuation of X5's telecommunication services is critical to the Debtor's

operation.  Assumption of the Agreement at this time will avoid disruption to the one of the

most often-used methods of communication in the Debtor's day-to-day operation and will

provide customers and creditors reassurance that this vital agreement for operation is

securely in place. The Debtor believes that assumption of the Agreement at this time on

the terms stated above is appropriate and in the best interests of the Debtor's estate.

6.      Pursuant to Code Sections 365 and 105, Debtor requests authority to

assume the telecommunications agreement with X5.

## THE AGREEMENT WITH X5

7.      The Debtor conducts a substantial portion of its communications through the

services provided by X5.  The ability of the Debtor to continue to use its

telecommunications is critical to its ongoing business operations.  In order to be in a

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

position to communicate with customers and business partners, the Debtor must be party to a telecommunication services agreement or similar agreement with a party that can provide comprehensive telecommunication services. The Debtor's Agreement with X5 is a telecommunication services agreement which satisfies this requirement.

8. Under the Agreement, X5 maintains telecommunication systems for local, long distance, and local access and transport area telecommunications. Such systems are necessary for Debtors daily communication with customers and business partners. X5's services are critical to Debtor's ability to conduct its day-to-day operations.

## RELIEF REQUESTED

9. The Debtor seeks an order authorizing assumption of the Agreement pursuant to section 365 of the Bankruptcy Code effective as of the Petition Date. As set forth above, telecommunication services are critical for Debtor's operations. Without a telecommunication services agreement to provide means of communication with customers and business partners, the Debtor would suffer a fatal competitive disadvantage and be unable to maintain any reasonable level of services. The continuation of the Agreement with X5 is essential to the preservation of the going concern value of the Debtor and to provide assurances to the Debtor's customers and creditors that this vital contract is not in danger of termination.

10. The Debtor has explored options with respect to entering into a telecommunication services agreement with other providers. However, switching telecommunication providers comes with significant time and expense. The Debtor does not believe that it would be able to obtain a telecommunication services agreement within a short period of time that would contain terms as favorable as provided by the Agreement.

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869

11.    Debtor requests that X5 consent to the assumption but without limitation or waiver of any claims, rights or remedies arising or incurred prior to or on the termination or breach, including, without limitation, chargeback rights and other rights and claims related to services provided by X5 prior to termination or breach, and such rights or claims will be entitled to administrative expense priority except to the extent provided in the previous sentence.

12.    The Debtor is in default under the Agreement in an approximate amount of $4,427.85.  Debtor believes that the cost to cure its default and resume regular payment of X5's service is minimal compared to the cost of obtaining comparable services from another telecommunications provider.  Therefore, assuming this Agreement is the most economical use of Debtor's funds.

13.    The Debtor asserts that assumption of the Agreement at this time is appropriate and in the best interest of its estate.

WHEREFORE, the Debtor requests an order authorizing the Debtor's assumption of the Agreement as described herein and for such further relief as the Court deems just and proper.

Respectfully submitted;

VANDEN BOS & CHAPMAN, LLP


By:/s/Robert J Vanden Bos_____
    Robert J Vanden Bos, OSB #78100
    Douglas R. Ricks, OSB #044026
    Christopher N. Coyle, OSB #07350
    Spencer C. Wilson, OSB #154498
    Of Attorneys for Debtor-in-Possession

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690--(503) 241-4869



*1520 4th Ave, Suite 500, Seattle WA 98101*
*Phone (206) 973-5800 Fax (206) 973-5899*

# MASTER SERVICE AGREEMENT

**ACCOUNT INFORMATION**

| Customer Name | | | Multiple Locations ? | ☑ No | ☐ Yes |
|---|---|---|---|---|---|
| Seaport Air Operations, LLC | | | | | |

| Service Address | | | Billing Address ☑ Same as Service address | | |
|---|---|---|---|---|---|
| 7505 NE Airport Way | | | 7505 NE Airport Way | | |

| City | State | Zip | City | State | Zip |
|---|---|---|---|---|---|
| Portland | OR | 97218 | Portland | OR | 97218 |

| BTN | Fax Number | Is Customer Tax Exempt? ☐ No ☐ Yes |
|---|---|---|
| (971) 340-1200 | (971) 732-7678 | |

| Primary Contact Name | Primary Phone | Primary Fax | Primary Email |
|---|---|---|---|
| James R. Day | (971) 340-1714 | | jim@seaportair.com |

| Technical Contact Name | Technical Phone | Technical Fax | Technical Email |
|---|---|---|---|
| Michael Ward | (503) 802-4004 | | mike@pnwtelco.com |

| Accounts Payable Name | AP Phone | AP Fax | Accounts Payable Email |
|---|---|---|---|
| James R. Day | (971) 340-1714 | | jim@seaportair.com |

**CREDIT INFORMATION**

| Bank Name | Bank Contact Person | Bank Phone |
|---|---|---|
| WELLS FARGO | LUI: B FAWNING | 903 787 3533 |

| Bank Account Number | Federal Identification Number (Tax ID#) | Current Bill Copy ☑ Yes ☐ No |
|---|---|---|
| 375 219 4435 | 26 - 2704822 | |

**Supply Three (3) Trade References**

| | Contact Name Robert Amone |
|---|---|
| (1) Name Kelner Pilatus Center | |
| Phone (807) 475-5353    Fax | Email |
| (2) Name Pacific Northwest Telco, Inc. | Contact Name Chris Suhr |
| Phone (503) 802-4002    Fax (503) 802-4001 | Email |
| (3) Name AREA AIR  LLC | Contact Name ERIC HUFER |
| Phone 503 LUL 3711    Fax 503 661 657? | Email ENGINEERING@AREA.COM |

**ORDER SUMMARY**

Product Schedule (check all that apply and complete schedules)    ☐ (A) Switched LD  ☑ (A) Toll Free  ☐ (H) Calling Card
☐ (B) Conference Calling  ☐ (C) Dedicated LD  ☐ (D) Dial Tone  ☐ (E) Private Line  ☐ (F) Internet  ☐ Other:

| Service Authorization | Service Term |
|---|---|
| ☑ Intra-State  ☑ Inter-State  ☑ Intra LATA | ☐ 1 Yr.  ☐ 2 Yrs.  ☐ 3 Yrs.  ☑ Other |

## TERM AND CONDITIONS

In consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

1. **Services:** X5 Solutions, Inc. ("X5"), agrees to provide and Customer agrees to accept and pay for Services and other associated services (collectively the "Services") as further described in the attached "Schedule" hereto and incorporated herein by reference, which describe the particular services, rates, specific terms and other information necessary or appropriate for X5 to provide the services to the Customer. The Services provided by X5 are subject to (i) the terms and conditions contained in this Master Service Agreement ("MSA"), (ii) the rates and discounts and other applicable terms set forth in attached Schedule(s) hereto from time to time and incorporated herein by reference, and (iii) each Service Request which is accepted hereunder. The attached Schedule(s), as subscribed to by the parties, shall set forth the Effective Date, the Service Term, Rates, Customer's minimum monthly commitment, if any, and other information necessary to provide the Services under this MSA. This MSA, and the applicable Schedules are sometimes collectively referred to as the "Agreement".

2. **Credit:** Customer's execution of this Agreement signifies Customer's acceptance of X5's initial and ongoing credit approval procedures and policies. X5 reserves the right to determine the credit worthiness of a Customer through available verification procedures and/or sources and consumer hereby consents to X5 obtaining credit information regarding the customer, its owners, and affiliates. If this financial information is not publicly available, then customer shall provide at X5's request its most current audited and unaudited financial statements. X5 reserves the right to withhold initiation, full implementation, and/or continued Services under this Agreement pending X5 initial satisfactory and ongoing credit review and approval thereof which may be conditioned upon terms specified by X5, including, but not limited to, security for payments due hereunder in the form of a cash deposit or other means. X5 reserves the right to modify its requirements, if any, with respect to any security or other assurance provided by Customer for payments due hereunder in light of Customer's actual usage when compared to projected usage levels upon which any security or assurance requirement was based.

"We, the above named company, have initiated a service agreement with X5 Solutions. In doing so, we have authorized X5 to determine credit worthiness through available verification procedures and/or sources. By signing below, I hereby consent to X5 obtaining such credit information regarding the company, its owners, and affiliates."

Signature and Title _____ CEO _____    Date 2/17/2009

3. **Term of Agreement:** Term of Agreement. This MSA is effective as to each Party when signed by that Party. The Term of the MSA will commence on the first day of the first month following the month in which X5 executes the Agreement. The Term of the MSA will continue for the period specified above.

4. **Term of Services:** The initial term for Service ("Initial Service Term") will be stated on the Service Order Schedule(s) and will begin on the first day of the month following the date the Service is installed and available. At the end of the Initial Service Term Customer must notify X5, in writing, sixty (60) days in advance of the end of their service term to cancel or change this Agreement, or the Agreement will automatically renew for the same service term, minimum monthly usage amount(s) and rate(s). The Service Term may be suspended without penalty if it is replaced by an X5 Agreement with a greater minimum monthly usage amount or a longer service term

2/17/2009    Page 1 of 3    Initials _____

**Exhibit A - Page 1 of 3**

Continued - X5 Solutions Master Service Agreement with Seaport Air Operations, LLC

**5. Start of Service:** X5 obligation to provide and Customer's obligation to accept and pay for non-usage sensitive charges for Services shall be limited to the extent provided for in this Agreement upon the submission of an acceptable Service Order to X5 by Customer. Once X5 has determined a circuit to be network ready, then services not accepted by the customer will begin billing after five (5) days and ALL components after three (30) days ("Start of Service"). Customer's obligation to pay for usage sensitive charges for Services shall commence with respect to any Switched Service as of the date the Switched Service in question is made available to and used by Customer

**6. Cancellation:** At any time after the Effective Date, Customer may cancel this Agreement if Customer provides written notification thereof to X5 not less than thirty (30) days prior to the effective date of cancellation. If this Agreement is terminated before the term is completed, Customer agrees to pay X5, within thirty (30) days, a one lump sum: (1) the fixed monthly recurring charge(s) multiplied by the number of months remaining in the service term, (II) any waived installation, monthly access charges and special promotional credits given, (III) and for usage-based services, customer also agrees to pay X5 a cancellation charge equal to the average monthly amount of the previous six months usage-based billing multiplied by the number of months remaining in the service term

**7. Modification of Charges:** X5 reserves the right to eliminate particular Services and/or modify charges for particular Services (which charge modifications shall not exceed then-current generally available X5 charges for comparable services), upon not less than thirty (30) days prior notice to Customer, which notice will state the effective date for the charge modification. In the event X5 notifies Customer of the elimination of a particular Switched Service and/or an increase in charges, Customer may terminate this Agreement without penalty (other than payment for Services provided by X5 up through the effective date of cancellation), in order to cancel such Switched Service(s), Customer must notify X5, in writing, at least twenty (20) days prior to the effective date of the increase in charges

**8. Monthly Payments:** X5 will provide monthly invoices covering thirty (30) day periods which will be due and payable twenty (20) days from invoice date. Usage-based charges are billed in arrears and fixed monthly recurring charges, if any, one (1) month in advance. A late payment fee will be applied on balances that remain unpaid twenty-two (22) days following the date of the invoice in the amount of 1 1/2 % per month of the amount of the unpaid balance from the date of invoice or the maximum interest amount allowed by applicable law. Customer shall be charged with all cost of collection, including but not limited to, attorney fees and court costs. Your prompt payment is appreciated. In addition, X5 shall not be liable for any accounts disconnected for non-payment. All rights reserved under such terms and under the Uniform Commercial Code

**9. Billing Adjustment:** X5 may make billing adjustments for X5 services for up to one (1) calendar year after the due date of the invoice, or after the date the service is rendered, whichever is later. X5 may make billing adjustments for third party services for a period of two (2) years after the due date of an invoice, or any time frame allowed by contract, law, government rule or regulation, whichever is later. Any billing adjustment(s) will not exceed the contracted rates, monthly recurring charges, and/or non-recurring charges

**10. Fraudulent/Unauthorized Calls:** The Customer accepts full responsibility for the charges associated with ALL services provided for Customer's account to include outbound, toll free, and calling card, regardless of whether Customer authorized the calls. Customer shall indemnify and hold X5 harmless from any and all costs, expenses, damages, claims or actions arising from fraudulent calls of any nature. Customer shall not be excused from paying X5 for Services provided to Customer or any portion thereof on the basis that fraudulent calls comprised a corresponding portion of the Services. In the event X5 discovers fraudulent calls being made or reasonably believes fraudulent calls are being made), nothing contained herein shall prohibit X5 from taking immediate action (without notice to Customer) that is reasonably necessary to prevent such fraudulent calls from taking place, including without limitation, denying Services to particular ANIs or terminating Services to distance charges and any local exchange carrier PIC and other applicable charges for that number(s) restoration.

**11. Billing Disputes:** Billing charges reasonably disputed by Customer (along with late fees attributable to such amounts) shall apply but shall not be due and payable for a period of sixty (60) days following the Due Date therefore, provided Customer, (I) pays all undisputed charges on or before the Due Date, (II) presents a written statement and supporting documentation of any billing discrepancies to X5 in reasonable detail on or before the Due Date of the invoice in question, and (III) negotiates in good faith with X5 for the purpose of resolving such dispute within said sixty (60) day period. In the event such dispute is mutually agreed upon and resolved in favor of X5, Customer agrees to pay X5 the disputed amounts together with any applicable late fees within twenty (20) days of the resolution (the "Alternate Due Date"). In the event such dispute is mutually agreed upon and resolved in favor of Customer, Customer will receive a credit for the disputed charges in question and the applicable late fees. In the event X5 has responded in Customer's dispute in writing and the parties fail to mutually resolve or settle the dispute within such sixty (60) day period (unless X5 has agreed in writing to extend such period) all disputed amounts together with late fees shall become due and payable, and this provision shall not be construed to prevent Customer from pursuing any available legal remedies. X5 shall not be obligated to consider any Customer notice of billing discrepancies which are received by X5 more than thirty (30) days following the Due Date of the invoice in question

**12. Suspension/Disconnection of Service:** In the event all undisputed charges due pursuant to X5 invoice are not paid in full by the Due Date or disputed charges owed by Customer, if any, are not paid in full by the Alternate Due Date, X5 shall have the right, after giving Customer at least five (5) days prior notice and opportunity to pay such charges within such 5-day period, to suspend or disconnect all or any portion of the Services to Customer ("Suspension/ Disconnection Notice") until such time (designated by X5 in its Suspension/ Disconnection Notice) as Customer has paid in full all undisputed charges then due to X5, including any late fees. Following such payment, X5 shall constitute Services to Customer only when Customer provides X5 with satisfactory assurance of Customer's ability to pay for such Services (i.e., a deposit, letter of credit or other means acceptable to X5) and Customer's advance payment of the cost of reinstituting such Services. If Customer fails to make the required payment by the date set forth in the Suspension/ Disconnection Notice, Customer will be deemed to have canceled this Agreement as of the date set forth in the Suspension/ Disconnection Notice which cancellation shall not relieve Customer for payment of the Cancellation Charge as described in Section 5

**13. Expedite Charges:** In the event Customer requests expedited services and X5 agrees to such request, X5 will pass through the charges assessed by any supplying parties (e.g., local access providers for such expedited services and/or changes to Service Requests involved in the Customer. X5 may further condition its performance of such request upon Customer's payment of such additional charges to X5.

**14. Taxes:** Customer acknowledges and understands that X5 computes all charges herein exclusive of any applicable federal, state or local use, excise, gross receipts, sales and privilege taxes, duties, fees or similar liabilities (other than general income or property taxes), whether charged to or against X5 or Customer because of the Services furnished to Customer ("Additional Charges") Customer shall pay such Additional Charges in addition to all other charges provided for herein. Customer will not be liable for certain Additional Charges if Customer provides X5 with an appropriate exemption certificate.

**15. Access:** The Customer designates X5 as their agent to authorize the selection of the Customer's primary long distance carrier for 1+ equal access dialing, 800/888/877/866 service, and /or dedicated access service. Customer understands that there will be no charge from the local telephone company for their initial selection of a primary long distance company. Any selection after the initial one may involve a charge by the local telephone company. Customer understands that only one primary carrier may be selected for any one telephone line

**16. Toll Free Service:** No individual or entity shall have, receive or retain any property interest in any toll free service number. Customer is responsible for all charges for toll free service provided by X5. X5 assumes no liability where any claim arises out of Customer being provided with a number(s) other than the one(s) requested by Customer. X5 shall not be liable whatsoever for the use, misuse or abuse of a Customer's toll free service by third parties, including, without limitation, the Customer's employees or members of the public who dial the Customer's toll free number by mistake.

**17. Universal Service Fund Charge:** A monthly Universal Service Fund charge shall be added to each bill based upon the total billed revenues. This charge shall be based upon the Federal Communications Commission assessment

**18. Presubscribed Inter-exchange Carrier Charge (PIC C):** A monthly FCC PICC shall be charged to each of the Customer's telephone number as follows:

| | | | |
|---|---|---|---|
| Primary resident line | $0.00/line | Multi-line business line | $4.31/line |
| Centrex line | $0.4K/line | Minimum monthly charge for Centrex | $0.4K/line |

**19. Pay Telephone (Payphone) Sur-charge:** A surcharge shall be assessed for each call made from a pay telephone to an toll free number or using a calling card and dialing the carrier prefix in the form 101XXXX. Although collected on your bill, this charge is reimbursed to pay telephone service providers. The initial charge is $0.65 per call, but may vary from time to time as the Federal Communications Commission or payphone service providers change the rate for pay telephone compensation

Continued - X5 Solutions Master Service Agreement with Sexport Air Operations, LLC

**20. RBOC Origination/Termination** Following start of long distance service, customer will maintain at least 80% of the minutes of termination and origination service traffic (during any calendar month or pan rata portion thereof) in a Tandem routed and operated by a Regional Bell Operating Company (RBOC) and subject to such RBOC's tariffed access charges. X5 at its sole discretion shall have the right to apply a $0.025 per minute surcharge to the number of minutes by which NonRBOC traffic exceeds 20% of total monthly minutes of customers overall long distance service

**21. International Dial Codes:** In the event of a change to an existing, or the creation of new International Dial Code(s), and as generally accepted as being industry-wide, X5 reserves the right, and Customer agrees to have its International Long Distance Termination Rates modified as X5 deems necessary to reflect the changes that such Dial Code modifications may require. The effective date for such modifications will be determined by X5 at its sole discretion

**22. Warranty:** X5 will use reasonable efforts under the circumstances to maintain its overall network quality. The quality of the Services provided hereunder shall be consistent with telecommunications common carrier industry standards, government regulations and sound business practices. X5 MAKES NO OTHER WARRANTIES ABOUT THE SERVICES PROVIDED HEREUNDER, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE.

**23. Liability/Interruption of Service:** Customer acknowledges that NO CARRIER OR OTHER PERSON PROVIDING, SELLING, ARRANGING OR RESELLING SERVICES ASSOCIATED WITH THIS AGREEMENT SHALL BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL OR OTHER DAMAGES WHATSOEVER (INCLUDING WITHOUT LIMITATION ANY DAMAGES CLAIMED FOR LOSS OF INCOME, REVENUE OR PROFITS OR FOR LOSS OF GOOD WILL) ARISING FROM ANY FAILURES, INTERRUPTIONS, DELAYS, ERRORS OR DEFECTS IN TRANSMISSION, EQUIPMENT OR SERVICES PROVIDED CUSTOMER UNDER THIS AGREEMENT. Customer shall be entitled, as its sole and exclusive remedy, to a pro-rata adjustment for any interruption of service in excess of twenty-four (24) consecutive hours after the interruption is brought to X5's attention. Under no circumstances shall such pro-rata charge exceed one (1) month's service. Customer understands and agrees that X5 and its underlying carriers shall not be liable to Customer or any other party for interruption or delays in transmission or failure to transmit, nor for special, incidental or consequential damages caused thereby, including lost profits or loss of goodwill (whether or not X5 has been advised of the possibility thereof) by reason of any breach, act or omission of X5 in its performance hereunder. Customer will indemnify and hold X5 harmless from and against any and all claims by any third party arising from or relating to provision of services to Customer under this Agreement

**24. Force Majeure:** If X5 performance of this Agreement or any obligation hereunder is prevented, restricted or interfered with by causes beyond its reasonable control including, but not limited to, act of God, fire, explosion, vandalism, cable cut, storm or other similar occurrence, any law, order, regulation, direction, action or request of the United States government, or state or local governments, or of any department, agency, commission, court, bureau, corporation or other instrumentality of any one or more such governments, or of any civil or military authority, or by national emergency, insurrection, riot, war, strike, lockout or work stoppage or other labor difficulties, or supplier failure, shortage, breach or delay, then X5 shall be excused from such performance on a day to day basis to the extent of such restriction or interference. X5 shall use reasonable efforts under the circumstances to avoid or remove such causes of nonperformance and shall proceed to perform with reasonable dispatch whenever such causes are removed or cease.

**25. Use of Service:** Upon X5 acceptance of a Service Request hereunder, X5 will provide the Services specified therein to Customer upon condition that such Services shall not be used for any unlawful purpose. The provision of Services is not intended to and will not create a partnership or joint venture between the parties or result in a joint communications service offering to any third parties, and X5 and Customer agree that this Agreement, to the extent it is subject to FCC regulation, is an inter-carrier agreement which is not subject to the filing requirements of Section 211(a) of the Communications Act of 1934 (47 U.S.C. § 211(a)) as implemented in 47 C F R § 43 51

**26. No Waiver:** No term or provision of this Agreement shall be deemed waived and no breach or default shall be deemed excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Consent to waiver of or excuse for a breach or default by either party, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any different or subsequent breach or default

**27. Confidential Information:** The parties understand and agree that the terms and conditions of this Agreement (but not the existence thereof), all documents referenced herein (including invoices to Customer for Services provided hereunder), communications between the parties regarding this Agreement or the Services to be provided hereunder (including price quotes to Customer for new services proposed to be provided or actually provided hereunder), as well as such information relevant to any other agreement between the parties (collectively "Confidential Information"), are confidential between Customer and X5 for a minimum period of one year or for the length of the agreement, whichever is longer

**28. Choice of Law; Forum:** This Agreement shall be construed under the laws of the State of Washington without regard to choice of law principles. Any legal action or proceeding with respect to this Agreement may be brought in the Courts of the State of Washington in King County. By execution of this Agreement, both Customer and X5 Solutions hereby submit to such jurisdiction, hereby expressly waiving whatever rights may correspond to either of them by reason of their present or future domicile. In furtherance of the foregoing, Customer and X5 Solutions hereby agree to service by U.S. Mail at the billing address indicated above. Such service shall be deemed effective upon the earlier of actual receipt or seven (7) days following the date of posting

**29. Assignment:** Customer shall not assign or otherwise transfer (including, without limitation, a transfer due to a "Change of Control") its rights or obligations under this Agreement without the prior written consent of X5, which shall not be unreasonably withheld. Customer must be current on all payments required by this Agreement before any assignment is approved by X5. Any such assignment or transfer of Customer's rights or obligations without such consent shall entitle X5 to disconnect the Services provided hereunder at its option upon ten (10) calendar days' prior written notice to Customer and shall constitute a default of a material obligation. A Change in Control shall be deemed to be an assignment, merger, sale of a controlling interest or other transfer of a controlling ownership interest

IN WITNESS WHEREOF, the parties have executed this Master Services Agreement (Services) as of the dates set forth below

|  X5 Solutions, Inc. | Customer |
|---|---|
| Print Name | Print Name James R. Day  CFO |
| Signature | Signature |
| Title | Title CFO |
| Date | Date February 2009 |

*Signature indicates that this person is duly authorized to execute this Agreement for said customer.*

| INTERNAL USE ONLY | | | |
|---|---|---|---|
| Account Number | Agent PNT | Sales Name MIKE WARD | Order EMR $500 |

Case 16-30406-rld11   Doc 239   Filed 04/22/16

In re  SeaPort Airlines, Inc.;
Chapter 11 Bankruptcy Case No. 16-30406-rld11

CERTIFICATE - TRUE COPY

DATE:                    April 22, 2016

DOCUMENT:         DEBTOR'S MOTION FOR AN ORDER AUTHORIZING DEBTOR
                          TO ASSUME A CERTAIN TELECOMMUNICATION SERVICES
                          AGREEMENT WITH X5 SOLUTIONS, INC.

        I hereby certify that I prepared the foregoing copy of the foregoing named
document and have carefully compared the same with the original thereof and it is a
correct copy therefrom and of the whole thereof.

CERTIFICATE OF SERVICE

        I hereby certify that I served a copy of the foregoing on:

| | | |
|---|---|---|
| SeaPort Airlines, Inc.<br>Attn:  Timothy Sieber<br>7505 NE Airport Way<br>Portland, OR  97218 | Michael J. Edelman<br>VEDDER PRICE<br>1633 Broadway, 47th Floor<br>New York, New York 10019 | Greg Ahlgren<br>Corporate Counsel<br>NovaTel / X5<br>11550 IH 10 West, Ste 110<br>San Antonio, TX 78230 |
| Tulare County Tax Collector<br>Attn Jorge Garcia<br>Deputy Tax Collector<br>221 S Mooney Blvd Rm 104-E<br>Visalia, CA 93291-4593 | Franklin C. Adams<br>POB 1028<br>Riverside, CA 92502-1028<br><br>Mark J. Wolfson<br>100 N Tampa St #2700<br>Tampa, FL 33602 | |

by mailing a copy of the above-named document to each of them in a sealed
envelope, addressed to each of them at his or her last known address.  Said
envelopes were deposited in the Post Office at Portland, Oregon, on the below date,
postage prepaid.

        I hereby certify that the foregoing was served on all CM/ECF participants
through the Court's Case Management/Electronic Case File system on the date set
forth below.

        Dated:  April 22, 2016

                          VANDEN BOS & CHAPMAN, LLP

                          By:/s/Robert J Vanden Bos
                             Robert J Vanden Bos, OSB #78100
                             Douglas R. Ricks, OSB #044026
                             Of Attorneys for Debtor-in-Possession